# ZABLOCKI, MILWAUKEE COUNTY CLERK *v.* REDHAIL

No. 76–879.   Argued October 4, 1977—Decided January 18, 1978

*Ward L. Johnson, Jr.,* Assistant Attorney General of Wisconsin, argued the cause for appellant. With him on the briefs were *Bronson C. La Follette,* Attorney General, *Robert P. Russell,* and *John R. Devitt.*

*Robert H. Blondis* argued the cause and filed briefs for appellee.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

At issue in this case is the constitutionality of a Wisconsin statute, Wis. Stat. §§ 245.10 (1), (4), (5) (1973), which provides that members of a certain class of Wisconsin residents may not marry, within the State or elsewhere, without first obtaining a court order granting permission to marry. The class is defined by the statute to include any "Wisconsin resident having minor issue not in his custody and which he is under obligation to support by any court order or judgment." The statute specifies that court permission cannot be granted unless the marriage applicant submits proof of compliance with the support obligation and, in addition, demonstrates that the children covered by the support order "are not then and are not likely thereafter to become public charges." No marriage license may lawfully be issued in Wisconsin to a person covered by the statute, except upon court order; any marriage entered into without compliance with § 245.10 is declared void; and persons acquiring marriage licenses in violation of the section are subject to criminal penalties.[1]

---

*Terry W. Rose* filed a brief for the Wisconsin Civil Liberties Union Foundation, Inc., as *amicus curiae* urging affirmance.

[1] Wisconsin Stat. § 245.10 provides in pertinent part:

"(1) No Wisconsin resident having minor issue not in his custody and

After being denied a marriage license because of his failure to comply with § 245.10, appellee brought this class action under 42 U. S. C. § 1983, challenging the statute as violative

---

which he is under obligation to support by any court order or judgment, may marry in this state or elsewhere, without the order of either the court of this state which granted such judgment or support order, or the court having divorce jurisdiction in the county of this state where such minor issue resides or where the marriage license application is made. No marriage license shall be issued to any such person except upon court order. The court, within 5 days after such permission is sought by verified petition in a special proceeding, shall direct a court hearing to be held in the matter to allow said person to submit proof of his compliance with such prior court obligation. No such order shall be granted, or hearing held, unless both parties to the intended marriage appear, and unless the person, agency, institution, welfare department or other entity having the legal or actual custody of such minor issue is given notice of such proceeding by personal service of a copy of the petition at least 5 days prior to the hearing, except that such appearance or notice may be waived by the court upon good cause shown, and, if the minor issue were of a prior marriage, unless a 5-day notice thereof is given to the family court commissioner of the county where such permission is sought, who shall attend such hearing, and to the family court commissioner of the court which granted such divorce judgment. If the divorce judgment was granted in a foreign court, service shall be made on the clerk of that court. Upon the hearing, if said person submits such proof and makes a showing that such children are not then and are not likely thereafter to become public charges, the court shall grant such order, a copy of which shall be filed in any prior proceeding . . . or divorce action of such person in this state affected thereby; otherwise permission for a license shall be withheld until such proof is submitted and such showing is made, but any court order withholding such permission is an appealable order. Any hearing under this section may be waived by the court if the court is satisfied from an examination of the court records in the case and the family support records in the office of the clerk of court as well as from disclosure by said person of his financial resources that the latter has complied with prior court orders or judgments affecting his minor children, and also has shown that such children are not then and are not likely thereafter to become public charges. No county clerk in this state shall issue such license to any person required to comply with this section unless

of the Equal Protection and Due Process Clauses of the Four-teenth Amendment and seeking declaratory and injunctive relief. The United States District Court for the Eastern District of Wisconsin held the statute unconstitutional under the Equal Protection Clause and enjoined its enforcement. 418 F. Supp. 1061 (1976). We noted probable jurisdiction, 429 U. S. 1089 (1977), and we now affirm.

## I

Appellee Redhail is a Wisconsin resident who, under the terms of § 245.10, is unable to enter into a lawful marriage in Wisconsin or elsewhere so long as he maintains his Wisconsin residency. The facts, according to the stipulation filed by the parties in the District Court, are as follows. In January 1972, when appellee was a minor and a high school student, a paternity action was instituted against him in Milwaukee County Court, alleging that he was the father of a baby girl

---

a certified copy of a court order permitting such marriage is filed with said county clerk.

    .            .            .            .            .

"(4) If a Wisconsin resident having such support obligations of a minor, as stated in sub. (1), wishes to marry in another state, he must, prior to such marriage, obtain permission of the court under sub. (1), except that in a hearing ordered or held by the court, the other party to the proposed marriage, if domiciled in another state, need not be present at the hearing. If such other party is not present at the hearing, the judge shall within 5 days send a copy of the order of permission to marry, stating the obligations of support, to such party not present.

"(5) This section shall have extraterritorial effect outside the state; and s. 245.04 (1) and (2) [providing that out-of-state marriages to circumvent Wisconsin law are void] are applicable hereto. Any marriage contracted without compliance with this section, where such compliance is required, shall be void, whether entered into in this state or elsewhere."

The criminal penalties for violation of § 245.10 are set forth in Wis. Stat. § 245.30 (1) (f) (1973). See *State* v. *Mueller*, 44 Wis. 2d 387, 171 N. W. 2d 414 (1969) (upholding criminal prosecution for failure to comply with § 245.10).

born out of wedlock on July 5, 1971. After he appeared and admitted that he was the child's father, the court entered an order on May 12, 1972, adjudging appellee the father and ordering him to pay $109 per month as support for the child until she reached 18 years of age. From May 1972 until August 1974, appellee was unemployed and indigent, and consequently was unable to make any support payments.[2]

On September 27, 1974, appellee filed an application for a marriage license with appellant Zablocki, the County Clerk of Milwaukee County,[3] and a few days later the application was denied on the sole ground that appellee had not obtained a court order granting him permission to marry, as required by § 245.10. Although appellee did not petition a state court thereafter, it is stipulated that he would not have been able to satisfy either of the statutory prerequisites for an order granting permission to marry. First, he had not satisfied his support obligations to his illegitimate child, and as of December 1974 there was an arrearage in excess of $3,700. Second, the child had been a public charge since her birth, receiving benefits under the Aid to Families with Dependent Children program. It is stipulated that the child's benefit payments were such that she would have been a public charge even if appellee had been current in his support payments.

On December 24, 1974, appellee filed his complaint in the District Court, on behalf of himself and the class of all Wisconsin residents who had been refused a marriage license pursuant to § 245.10 (1) by one of the county clerks in Wisconsin. Zablocki was named as the defendant, individually

---

[2] The record does not indicate whether appellee obtained employment subsequent to August 1974.

[3] Under Wisconsin law, "[m]arriage may be validly solemnized and contracted [within the] state only after a license has been issued therefor," Wis. Stat. § 245.16 (1973), and (with an exception not relevant here) the license must be obtained from "the county clerk of the county in which one of the parties has resided for at least 30 days immediately prior to making application therefor," § 245.05.

and as representative of a class consisting of all county clerks in the State. The complaint alleged, among other things, that appellee and the woman he desired to marry were expecting a child in March 1975 and wished to be lawfully married before that time. The statute was attacked on the grounds that it deprived appellee, and the class he sought to represent, of equal protection and due process rights secured by the First, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution.

A three-judge court was convened pursuant to 28 U. S. C. §§ 2281, 2284. Appellee moved for certification of the plaintiff and defendant classes named in his complaint, and by order dated February 20, 1975, the plaintiff class was certified under Fed. Rule Civ. Proc. 23 (b)(2).[4] After the parties filed the stipulation of facts, and briefs on the merits, oral argument was heard in the District Court on June 23, 1975, with a representative from the Wisconsin Attorney General's office participating in addition to counsel for the parties.

The three-judge court handed down a unanimous decision on August 31, 1976. The court ruled, first, that it was not required to abstain from decision under the principles set forth in *Huffman* v. *Pursue, Ltd.*, 420 U. S. 592 (1975), and *Younger* v. *Harris*, 401 U. S. 37 (1971), since there was no pending state-court proceeding that could be frustrated by the declaratory and injunctive relief requested.[5] Second, the court held

---

[4] The order defined the plaintiff class as follows:

"All Wisconsin residents who have minor issue not in their custody and who are under an obligation to support such minor issue by any court order or judgment and to whom the county clerk has refused to issue a marriage license without a court order, pursuant to § 245.10 (1), Wis. Stats. (1971)."

The order also established a briefing schedule on appellee's motion for certification of a defendant class. Although appellee thereafter filed a brief in support of the motion, appellant never submitted a brief in opposition.

[5] 418 F. Supp. 1061, 1064–1065. The possibility that abstention might

that the class of all county clerks in Wisconsin was a proper defendant class under Rules 23 (a) and (b) (2), and that neither Rule 23 nor due process required prejudgment notice to the members of the plaintiff or the defendant class.[6]

be required under our decision in *Huffman* v. *Pursue, Ltd.*, was raised by the District Court, *sua sponte*, at argument before that court. Appellee subsequently filed a memorandum contending that abstention was not required; appellant did not submit a response. Appellant now argues, on this appeal, that the District Court failed to consider the "doctrine of federalism" set forth in *Younger* and *Huffman*. According to appellant, proper consideration of this doctrine would have led the District Court to require appellee to bring suit first in the state courts, in order to give those courts the initial opportunity to pass on his constitutional attack against § 245.10. We cannot agree.

First, the District Court was correct in finding *Huffman* and *Younger* inapplicable, since there was no pending state-court proceeding in which appellee could have challenged the statute. See *Wooley* v. *Maynard*, 430 U. S. 705, 710–711 (1977). Second, there are no ambiguities in the statute for the state courts to resolve, and—absent issues of state law that might affect the posture of the federal constitutional claims—this Court has uniformly held that individuals seeking relief under 42 U. S. C. § 1983 need not present their federal constitutional claims in state court before coming to a federal forum. See, *e. g., Wisconsin* v. *Constantineau*, 400 U. S. 433, 437–439 (1971); *Zwickler* v. *Koota*, 389 U. S. 241, 245–252 (1967). See also *Huffman* v. *Pursue, Ltd.*, 420 U. S., at 609–610, n. 21.

Appellant also contends on this appeal, for the first time, that the District Court should have abstained out of "regard for the independence of state governments in carrying out their domestic policy." Brief for Appellant 16, citing *Burford* v. *Sun Oil Co.*, 319 U. S. 315, 317–318 (1943). Unlike *Burford*, however, this case does not involve complex issues of state law, resolution of which would be "disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River Water Conservation Dist.* v. *United States*, 424 U. S. 800, 814–815 (1976). And there is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy.

[6] 418 F. Supp., at 1065–1068. Appellant has not appealed the District Court's finding that the defendant class satisfied the requirements of Rules 23 (a) and (b) (2), the court's definition of the class to include all county clerks in Wisconsin, or the requirement that appellant send a copy of

On the merits, the three-judge panel analyzed the challenged statute under the Equal Protection Clause and concluded that "strict scrutiny" was required because the classification created by the statute infringed upon a fundamental right, the right to marry.[7] The court then proceeded to evaluate the interests advanced by the State to justify the statute, and, finding that the classification was not necessary for the achievement of those interests, the court held the statute invalid and enjoined the county clerks from enforcing it.[8]

Appellant brought this direct appeal pursuant to 28 U. S. C.

the judgment to each of the county clerks, and those issues are therefore not before us. Appellant does claim on this appeal that due process required prejudgment notice to the members of the defendant class if the judgment was to be binding on them. As this issue has been framed, however, we cannot perceive appellant's "personal stake in the outcome," *Baker* v. *Carr,* 369 U. S. 186, 204 (1962), and we therefore hold that appellant lacks standing to raise the claim. Appellant would be bound, regardless of what we concluded as to the judgment's binding effect on absent members of the defendant class, and appellant has not asserted that he was injured in any way by the maintenance of this suit as a defendant class action. Indeed, appellant never filed a brief in the District Court in opposition to the defendant class, despite being invited to do so, see n. 4, *supra,* and the notice issue was briefed for the first time on this appeal, after the Wisconsin Attorney General took over as lead counsel for appellant. In these circumstances, the absent class members must be content to assert their due process rights for themselves, through collateral attack or otherwise. See *Hansberry* v. *Lee,* 311 U. S. 32 (1940); Advisory Committee Notes on 1966 Amendment to Rule 23, 28 U. S. C. App., p. 7768, citing Restatement of Judgments § 86, Comment (h), § 116 (1942). We note, in any event, that in light of our disposition of this case and the recent revision of Wisconsin's Family Code, see n. 9, *infra,* the question of binding effect on the absent members may be wholly academic.

[7] 418 F. Supp., at 1068–1071. The court found an additional justification for applying strict scrutiny in the fact that the statute discriminates on the basis of wealth, absolutely denying individuals the opportunity to marry if they lack sufficient financial resources to make the showing required by the statute. *Id.,* at 1070, citing *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 20 (1973).

[8] 418 F. Supp., at 1071–1073.

§ 1253, claiming that the three-judge court erred in finding §§ 245.10 (1), (4), (5) invalid under the Equal Protection Clause. Appellee defends the lower court's equal protection holding and, in the alternative, urges affirmance of the District Court's judgment on the ground that the statute does not satisfy the requirements of substantive due process. We agree with the District Court that the statute violates the Equal Protection Clause.[9]

---

[9] Counsel for appellee informed us at oral argument that appellee was married in Illinois some time after argument on the merits in the District Court, but prior to judgment. Tr. of Oral Arg. 23, 30–31. This development in no way moots the issues before us. First, appellee's individual claim is unaffected, since he is still a Wisconsin resident and the Illinois marriage is consequently void under the provisions of §§ 245.10 (1), (4), (5). See State v. Mueller, 44 Wis. 2d 387, 171 N. W. 2d 414 (1969) (§ 245.10 has extraterritorial effect with respect to Wisconsin residents). Second, regardless of the current status of appellee's individual claim, the dispute over the statute's constitutionality remains live with respect to members of the class appellee represents, and the Illinois marriage took place well after the class was certified. See Franks v. Bowman Transp. Co., 424 U. S. 747, 752–757 (1976); Sosna v. Iowa, 419 U. S. 393, 397–403 (1975).

After argument in this Court, the Acting Governor of Wisconsin signed into law a comprehensive revision of the State's marriage laws, effective February 1, 1978. 1977 Wis. Laws, ch. 105, Wis. Legis. Serv. (West 1977). The revision added a new section (§ 245.105) which appears to be a somewhat narrower version of § 245.10. Enactment of this new provision also does not moot our inquiry into the constitutionality of § 245.10. By its terms, the new section "shall be enforced only when the provisions of § 245.10 and utilization of the procedures thereunder are stayed or enjoined by the order of any court." § 245.105 (8). As we read this somewhat unusual proviso, and as it was explained to us at argument by the representative of the Wisconsin Attorney General, Tr. of Oral Arg. 4–10, the new section is meant only to serve as a stopgap during such time as enforcement of § 245.10 is barred by court order. Were we to vacate the District Court's injunction on this appeal, § 245.10 would go back into full force and effect; accordingly, the dispute over its validity is quite live. We express no judgment on the constitutionality of the new section.

## II

In evaluating §§ 245.10 (1), (4), (5) under the Equal Protection Clause, "we must first determine what burden of justification the classification created thereby must meet, by looking to the nature of the classification and the individual interests affected." *Memorial Hospital* v. *Maricopa County*, 415 U. S. 250, 253 (1974). Since our past decisions make clear that the right to marry is of fundamental importance, and since the classification at issue here significantly interferes with the exercise of that right, we believe that "critical examination" of the state interests advanced in support of the classification is required. *Massachusetts Board of Retirement* v. *Murgia*, 427 U. S. 307, 312, 314 (1976); see, *e. g., San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 17 (1973).

The leading decision of this Court on the right to marry is *Loving* v. *Virginia*, 388 U. S. 1 (1967). In that case, an interracial couple who had been convicted of violating Virginia's miscegenation laws challenged the statutory scheme on both equal protection and due process grounds. The Court's opinion could have rested solely on the ground that the statutes discriminated on the basis of race in violation of the Equal Protection Clause. *Id.*, at 11–12. But the Court went on to hold that the laws arbitrarily deprived the couple of a fundamental liberty protected by the Due Process Clause, the freedom to marry. The Court's language on the latter point bears repeating:

> "The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.
>
> "Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival." *Id.*, at 12, quoting *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 541 (1942).

Although *Loving* arose in the context of racial discrimination, prior and subsequent decisions of this Court confirm that the right to marry is of fundamental importance for all individuals. Long ago, in *Maynard* v. *Hill,* 125 U. S. 190 (1888), the Court characterized marriage as "the most important relation in life," *id.,* at 205, and as "the foundation of the family and of society, without which there would be neither civilization nor progress," *id.,* at 211. In *Meyer* v. *Nebraska,* 262 U. S. 390 (1923), the Court recognized that the right "to marry, establish a home and bring up children" is a central part of the liberty protected by the Due Process Clause, *id.,* at 399, and in *Skinner* v. *Oklahoma ex rel. Williamson, supra,* marriage was described as "fundamental to the very existence and survival of the race," 316 U. S., at 541.

More recent decisions have established that the right to marry is part of the fundamental "right of privacy" implicit in. the Fourteenth Amendment's Due Process Clause. In *Griswold* v. *Connecticut,* 381 U. S. 479 (1965), the Court observed:

> "We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions." *Id.,* at 486.

See also *id.,* at 495 (Goldberg, J., concurring); *id.,* at 502–503 (WHITE, J., concurring in judgment).

Cases subsequent to *Griswold* and *Loving* have routinely categorized the decision to marry as among the personal decisions protected by the right of privacy. See generally *Whalen* v. *Roe,* 429 U. S. 589, 598–600, and nn. 23–26 (1977). For

example, last Term in *Carey* v. *Population Services International,* 431 U. S. 678 (1977), we declared:

> "While the outer limits of [the right of personal privacy] have not been marked by the Court, it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions 'relating to marriage, *Loving* v. *Virginia,* 388 U. S. 1, 12 (1967); procreation, *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535, 541–542 (1942); contraception, *Eisenstadt* v. *Baird,* 405 U. S., at 453–454; *id.,* at 460, 463–465 (WHITE, J., concurring in result); family relationships, *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (1944); and child rearing and education, *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535 (1925); *Meyer* v. *Nebraska,* [262 U. S. 390, 399 (1923)].' " *Id.,* at 684–685, quoting *Roe* v. *Wade,* 410 U. S. 113, 152–153 (1973).

See also *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632, 639–640 (1974) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment"); *Smith* v. *Organization of Foster Families,* 431 U. S. 816, 842–844 (1977); *Moore* v. *East Cleveland,* 431 U. S. 494, 499 (1977); *Paul* v. *Davis,* 424 U. S. 693, 713 (1976).[10]

---

[10] Further support for the fundamental importance of marriage is found in our decisions dealing with rights of access to courts in civil cases. In *Boddie* v. *Connecticut,* 401 U. S. 371 (1971), we wrote that "marriage involves interests of basic importance in our society," *id.,* at 376, and held that filing fees for divorce actions violated the due process rights of indigents unable to pay the fees. Two years later, in *United States* v. *Kras,* 409 U. S. 434 (1973), the Court concluded that filing fees in bankruptcy actions did not deprive indigents of due process or equal protection. *Boddie* was distinguished on several grounds, including the following: "The denial of access to the judicial forum in *Boddie* touched directly . . . on the marital relationship and on the associational interests that surround the establishment and dissolution of that relationship. On many occa-

It is not surprising that the decision to marry has been placed on the same level of importance as decisions relating to procreation, childbirth, child rearing, and family relationships. As the facts of this case illustrate, it would make little sense to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of the family in our society. The woman whom appellee desired to marry had a fundamental right to seek an abortion of their expected child, see *Roe* v. *Wade, supra,* or to bring the child into life to suffer the myriad social, if not economic, disabilities that the status of illegitimacy brings, see *Trimble* v. *Gordon,* 430 U. S. 762, 768–770, and n. 13 (1977); *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164, 175–176 (1972). Surely, a decision to marry and raise the child in a traditional family setting must receive equivalent protection. And, if appellee's right to procreate means anything at all, it must imply some right to enter the only relationship in which the State of Wisconsin allows sexual relations legally to take place.[11]

By reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed. See *Califano* v. *Jobst, ante,* p. 47;

---

sions we have recognized the fundamental importance of these interests under our Constitution. See, for example, *Loving* v. *Virginia* . . . ." 409 U. S., at 444.

See also *id.,* at 446 ("Bankruptcy is hardly akin to free speech or marriage . . . [,] rights . . . that the Court has come to regard as fundamental").

[11] Wisconsin punishes fornication as a criminal offense:

"Whoever has sexual intercourse with a person not his spouse may be fined not more than $200 or imprisoned not more than 6 months or both." Wis. Stat. § 944.15 (1973).

n. 12, *infra.* The statutory classification at issue here, however, clearly does interfere directly and substantially with the right to marry.

Under the challenged statute, no Wisconsin resident in the affected class may marry in Wisconsin or elsewhere without a court order, and marriages contracted in violation of the statute are both void and punishable as criminal offenses. Some of those in the affected class, like appellee, will never be able to obtain the necessary court order, because they either lack the financial means to meet their support obligations or cannot prove that their children will not become public charges. These persons are absolutely prevented from getting married. Many others, able in theory to satisfy the statute's requirements, will be sufficiently burdened by having to do so that they will in effect be coerced into forgoing their right to marry. And even those who can be persuaded to meet the statute's requirements suffer a serious intrusion into their freedom of choice in an area in which we have held such freedom to be fundamental.[12]

---

[12] The directness and substantiality of the interference with the freedom to marry distinguish the instant case from *Califano* v. *Jobst, ante,* p. 47. In *Jobst,* we upheld sections of the Social Security Act providing, *inter alia,* for termination of a dependent child's benefits upon marriage to an individual not entitled to benefits under the Act. As the opinion for the Court expressly noted, the rule terminating benefits upon marriage was not "an attempt to interfere with the individual's freedom to make a decision as important as marriage." *Ante,* at 54. The Social Security provisions placed no direct legal obstacle in the path of persons desiring to get married, and—notwithstanding our Brother REHNQUIST's imaginative recasting of the case, see dissenting opinion, *post,* at 408—there was no evidence that the laws significantly discouraged, let alone made "practically impossible," any marriages. Indeed, the provisions had not deterred the individual who challenged the statute from getting married, even though he and his wife were both disabled. See *Califano* v. *Jobst, ante,* at 48. See also *ante,* at 57 n. 17 (because of availability of other federal benefits, total payments to the Jobsts after marriage were only $20 per month less than they would have been had Mr. Jobst's child benefits not been terminated).

### III

When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests. See, *e. g., Carey* v. *Population Services International,* 431 U. S., at 686; *Memorial Hospital* v. *Maricopa County,* 415 U. S., at 262–263; *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S., at 16–17; *Bullock* v. *Carter,* 405 U. S. 134, 144 (1972). Appellant asserts that two interests are served by the challenged statute: the permission-to-marry proceeding furnishes an opportunity to counsel the applicant as to the necessity of fulfilling his prior support obligations; and the welfare of the out-of-custody children is protected. We may accept for present purposes that these are legitimate and substantial interests, but, since the means selected by the State for achieving these interests unnecessarily impinge on the right to marry, the statute cannot be sustained.

There is evidence that the challenged statute, as originally introduced in the Wisconsin Legislature, was intended merely to establish a mechanism whereby persons with support obligations to children from prior marriages could be counseled before they entered into new marital relationships and incurred further support obligations.[13] Court permission to marry was to be required, but apparently permission was automatically to be granted after counseling was completed.[14] The statute actually enacted, however, does not expressly require or provide for any counseling whatsoever, nor for any automatic granting of permission to marry by the court,[15] and thus it can

---

[13] See Wisconsin Legislative Council Notes, 1959, reprinted following Wis. Stat. Ann. § 245.10 (Supp. 1977–1978); 5 Wisconsin Legislative Council, General Report 68 (1959).

[14] See *ibid.*

[15] Although the statute as originally enacted in 1959 did not provide for automatic granting of permission, it did allow the court to grant

hardly be justified as a means for ensuring counseling of the persons within its coverage. Even assuming that counseling does take place—a fact as to which there is no evidence in the record—this interest obviously cannot support the withholding of court permission to marry once counseling is completed.

With regard to safeguarding the welfare of the out-of-custody children, appellant's brief does not make clear the connection between the State's interest and the statute's requirements. At argument, appellant's counsel suggested that, since permission to marry cannot be granted unless the applicant shows that he has satisfied his court-determined support obligations to the prior children and that those children will not become public charges, the statute provides incentive for the applicant to make support payments to his children. Tr. of Oral Arg. 17–20. This "collection device" rationale cannot justify the statute's broad infringement on the right to marry.

First, with respect to individuals who are unable to meet the statutory requirements, the statute merely prevents the applicant from getting married, without delivering any money at all into the hands of the applicant's prior children. More importantly, regardless of the applicant's ability or willingness to meet the statutory requirements, the State already has numerous other means for exacting compliance with support obligations, means that are at least as effective as the instant statute's and yet do not impinge upon the right to marry. Under Wisconsin law, whether the children are from a prior marriage or were born out of wedlock, court-determined support obligations may be enforced directly via

permission if it found "good cause" for doing so, even in the absence of a showing that support obligations were being met. 1959 Wis. Laws, ch. 595, § 17. In 1961, the good-cause provision was deleted, and the requirement of a showing that the out-of-custody children are not and will not become public charges was added. 1961 Wis. Laws, ch. 505, § 11.

wage assignments, civil contempt proceedings, and criminal penalties.[16]    And, if the State believes that parents of children out of their custody should be responsible for ensuring that those children do not become public charges, this interest can be achieved by adjusting the criteria used for determining the amounts to be paid under their support orders.

There is also some suggestion that § 245.10 protects the ability of marriage applicants to meet support obligations to prior children by preventing the applicants from incurring new support obligations.    But the challenged provisions of § 245.10 are grossly underinclusive with respect to this purpose, since they do not limit in any way new financial commitments by the applicant other than those arising out of the contemplated marriage.    The statutory classification is substantially over-inclusive as well: Given the possibility that the new spouse will actually better the applicant's financial situation, by contributing income from a job or otherwise, the statute in many cases may prevent affected individuals from improving their ability to satisfy their prior support obligations.    And, although it is true that the applicant will incur support obligations to any children born during the contemplated marriage, preventing the marriage may only result in the children being born out of wedlock, as in fact occurred in appellee's case.    Since the support obligation is the same whether the child is born in or out of wedlock, the net result of preventing the marriage is simply more illegitimate children.

The statutory classification created by §§ 245.10 (1), (4),

---

[16] Wisconsin statutory provisions for civil enforcement of support obligations to children from a prior marriage include §§ 247.232 (wage assignment), 247.265 (same), and 295.03 (civil contempt).    Support obligations arising out of paternity actions may be civilly enforced under §§ 52.21 (2) (wage assignment) and 52.40 (civil contempt).    See also § 52.39.    In addition, failure to meet support obligations may result in conviction of the felony offense of abandonment of a minor child, § 52.05, or the misdemeanor of failure to support a minor child, § 52.055.

(5) thus cannot be justified by the interests advanced in support of it. The judgment of the District Court is, accordingly,

*Affirmed.*

MR. CHIEF JUSTICE BURGER, concurring.

I join MR. JUSTICE MARSHALL's opinion for the Court. With all deference, MR. JUSTICE STEVENS' opinion does not persuade me that the analysis in the Court's opinion is in any significant way inconsistent with the Court's unanimous holding in *Califano* v. *Jobst, ante,* p. 47. Unlike the intentional and substantial interference with the right to marry effected by the Wisconsin statute at issue here, the Social Security Act provisions challenged in *Jobst* did not constitute an "attempt to interfere with the individual's freedom to make a decision as important as marriage," *Califano* v. *Jobst, ante,* at 54, and, at most, had an indirect impact on that decision. It is with this understanding that I join the Court's opinion today.

MR. JUSTICE STEWART, concurring in the judgment.

I cannot join the opinion of the Court. To hold, as the Court does, that the Wisconsin statute violates the Equal Protection Clause seems to me to misconceive the meaning of that constitutional guarantee. The Equal Protection Clause deals not with substantive rights or freedoms but with invidiously discriminatory classifications. *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 59 (concurring opinion). The paradigm of its violation is, of course, classification by race. *McLaughlin* v. *Florida,* 379 U. S. 184; *Loving* v. *Virginia,* 388 U. S. 1, 13 (concurring opinion).

Like almost any law, the Wisconsin statute now before us affects some people and does not affect others. But to say that it thereby creates "classifications" in the equal protection sense strikes me as little short of fantasy. The problem in this case is not one of discriminatory classifications, but of unwarranted encroachment upon a constitutionally protected

freedom. I think that the Wisconsin statute is unconstitutional because it exceeds the bounds of permissible state regulation of marriage, and invades the sphere of liberty protected by the Due Process Clause of the Fourteenth Amendment.

I

I do not agree with the Court that there is a "right to marry" in the constitutional sense. That right, or more accurately that privilege,[1] is under our federal system peculiarly one to be defined and limited by state law. *Sosna* v. *Iowa,* 419 U. S. 393, 404. A State may not only "significantly interfere with decisions to enter into the marital relationship,"[2] but may in many circumstances absolutely prohibit it. Surely, for example, a State may legitimately say that no one can marry his or her sibling, that no one can marry who is not at least 14 years old, that no one can marry without first passing an examination for venereal disease, or that no one can marry who has a living husband or wife. But, just as surely, in regulating the intimate human relationship of marriage, there is a limit beyond which a State may not constitutionally go.

The Constitution does not specifically mention freedom to marry, but it is settled that the "liberty" protected by the Due Process Clause of the Fourteenth Amendment embraces more than those freedoms expressly enumerated in the Bill of Rights. See *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, 238–239; *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534–535; *Meyer* v. *Nebraska,* 262 U. S. 390, 399–400. Cf. *Shapiro* v. *Thompson,* 394 U. S. 618, 629–630; *United States* v. *Guest,* 383 U. S. 745, 757–758; *Aptheker* v. *Secretary of State,* 378 U. S. 500, 505; *Kent* v. *Dulles,* 357 U. S. 116, 127; *Truax* v. *Raich,* 239 U. S. 33, 41. And the decisions of this Court

---

[1] See Hohfeld, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L. J. 16 (1913).

[2] See *ante,* at 386.

have made clear that freedom of personal choice in matters of marriage and family life is one of the liberties so protected. *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632, 639; *Roe* v. *Wade,* 410 U. S. 113, 152–153; *Loving* v. *Virginia, supra,* at 12; *Griswold* v. *Connecticut,* 381 U. S. 479, 485–486; *Pierce* v. *Society of Sisters, supra; Meyer* v. *Nebraska, supra.* See also *Prince* v. *Massachusetts,* 321 U. S. 158; *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535, 541.

It is evident that the Wisconsin law now before us directly abridges that freedom. The question is whether the state interests that support the abridgment can overcome the substantive protections of the Constitution.

The Wisconsin law makes permission to marry turn on the payment of money in support of one's children by a previous marriage or liaison. Those who cannot show both that they have kept up with their support obligations and that their children are not and will not become wards of the State are altogether prohibited from marrying.

If Wisconsin had said that no one could marry who had not paid all of the fines assessed against him for traffic violations, I suppose the constitutional invalidity of the law would be apparent. For while the state interest would certainly be legitimate, that interest would be both disproportionate and unrelated to the restriction of liberty imposed by the State. But the invalidity of the law before us is hardly so clear, because its restriction of liberty seems largely to be imposed only on those who have abused the same liberty in the past.

Looked at in one way, the law may be seen as simply a collection device additional to those used by Wisconsin and other States for enforcing parental support obligations. But since it operates by denying permission to marry, it also clearly reflects a legislative judgment that a person should not be permitted to incur new family financial obligations until he has fulfilled those he already has. Insofar as this judgment is paternalistic rather than punitive, it manifests a concern

for the economic well-being of a prospective marital household. These interests are legitimate concerns of the State. But it does not follow that they justify the absolute deprivation of the benefits of a legal marriage.

On several occasions this Court has held that a person's inability to pay money demanded by the State does not justify the total deprivation of a constitutionally protected liberty. In *Boddie* v. *Connecticut,* 401 U. S. 371, the Court held that the State's legitimate purposes in collecting filing fees for divorce actions were insufficient under the Due Process Clause to deprive the indigent of access to the courts where that access was necessary to dissolve the marital relationship. In *Tate* v. *Short,* 401 U. S. 395, and *Williams* v. *Illinois,* 399 U. S. 235, the Court held that an indigent offender could not have his term of imprisonment increased, and his liberty curtailed, simply by reason of his inability to pay a fine.

The principle of those cases applies here as well. The Wisconsin law makes no allowance for the truly indigent. The State flatly denies a marriage license to anyone who cannot afford to fulfill his support obligations and keep his children from becoming wards of the State. We may assume that the State has legitimate interests in collecting delinquent support payments and in reducing its welfare load. We may also assume that, as applied to those who can afford to meet the statute's financial requirements but choose not to do so, the law advances the State's objectives in ways superior to other means available to the State. The fact remains that some people simply cannot afford to meet the statute's financial requirements. To deny these people permission to marry penalizes them for failing to do that which they cannot do. Insofar as it applies to indigents, the state law is an irrational means of achieving these objectives of the State.

As directed against either the indigent or the delinquent parent, the law is substantially more rational if viewed as a means of assuring the financial viability of future marriages.

In this context, it reflects a plausible judgment that those who have not fulfilled their financial obligations and have not kept their children off the welfare rolls in the past are likely to encounter similar difficulties in the future. But the State's legitimate concern with the financial soundness of prospective marriages must stop short of telling people they may not marry because they are too poor or because they might persist in their financial irresponsibility. The invasion of constitutionally protected liberty and the chance of erroneous prediction are simply too great. A legislative judgment so alien to our traditions and so offensive to our shared notions of fairness offends the Due Process Clause of the Fourteenth Amendment.

## II

In an opinion of the Court half a century ago, Mr. Justice Holmes described an equal protection claim as "the usual last resort of constitutional arguments." *Buck* v. *Bell,* 274 U. S. 200, 208. Today equal protection doctrine has become the Court's chief instrument for invalidating state laws. Yet, in a case like this one, the doctrine is no more than substantive due process by another name.

Although the Court purports to examine the bases for legislative classifications and to compare the treatment of legislatively defined groups, it actually erects substantive limitations on what States may do. Thus, the effect of the Court's decision in this case is not to require Wisconsin to draw its legislative classifications with greater precision or to afford similar treatment to similarly situated persons. Rather, the message of the Court's opinion is that Wisconsin may not use its control over marriage to achieve the objectives of the state statute. Such restrictions on basic governmental power are at the heart of substantive due process.

The Court is understandably reluctant to rely on substantive due process. See *Roe* v. *Wade,* 410 U. S. at 167–168 (concurring opinion). But to embrace the essence of that doctrine under the guise of equal protection serves no purpose

but obfuscation. "[C]ouched in slogans and ringing phrases," the Court's equal protection doctrine shifts the focus of the judicial inquiry away from its proper concerns, which include "the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, the existence of alternative means for effectuating the purpose, and the degree of confidence we may have that the statute reflects the legislative concern for the purpose that would legitimately support the means chosen." *Williams* v. *Illinois, supra,* at 260 (Harlan, J., concurring in result).

To conceal this appropriate inquiry invites mechanical or thoughtless application of misfocused doctrine. To bring it into the open forces a healthy and responsible recognition of the nature and purpose of the extreme power we wield when, in invalidating a state law in the name of the Constitution, we invalidate *pro tanto* the process of representative democracy in one of the sovereign States of the Union.

MR. JUSTICE POWELL, concurring in the judgment.

I concur in the judgment of the Court that Wisconsin's restrictions on the exclusive means of creating the marital bond, erected by Wis. Stat. §§ 245.10 (1), (4), and (5) (1973), cannot meet applicable constitutional standards. I write separately because the majority's rationale sweeps too broadly in an area which traditionally has been subject to pervasive state regulation. The Court apparently would subject all state regulation which "directly and substantially" interferes with the decision to marry in a traditional family setting to "critical examination" or "compelling state interest" analysis. Presumably, "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed." *Ante,* at 386. The Court does not present, however, any principled means for distinguishing between the two types of regulations. Since state regulation in

this area typically takes the form of a prerequisite or barrier to marriage or divorce, the degree of "direct" interference with the decision to marry or to divorce is unlikely to provide either guidance for state legislatures or a basis for judicial oversight.

## I

On several occasions, the Court has acknowledged the importance of the marriage relationship to the maintenance of values essential to organized society. "This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632, 639–640 (1974). Our decisions indicate that the guarantee of personal privacy or autonomy secured against unjustifiable governmental interference by the Due Process Clause "has some extension to activities relating to marriage, *Loving* v. *Virginia,* 388 U. S. 1, 12 (1967) . . . ." *Roe* v. *Wade,* 410 U. S. 113, 152 (1973). "While the outer limits of this aspect of privacy have not been marked by the Court, it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions 'relating to marriage. . . .' " *Carey* v. *Population Services International,* 431 U. S. 678, 684–685 (1977).

Thus, it is fair to say that there is a right of marital and familial privacy which places some substantive limits on the regulatory power of government. But the Court has yet to hold that all regulation touching upon marriage implicates a "fundamental right" triggering the most exacting judicial scrutiny.[1]

---

[1] Although the cases cited in the text indicate that there is a sphere of privacy or autonomy surrounding an existing marital relationship into which the State may not lightly intrude, they do not necessarily suggest that the same barrier of justification blocks regulation of the conditions of entry into or the dissolution of the marital bond. See generally Henkin, Privacy and Autonomy, 74 Colum. L. Rev. 1410, 1429–1432 (1974).

The principal authority cited by the majority is *Loving* v. *Virginia,* 388 U. S. 1 (1967). Although *Loving* speaks of the "freedom to marry" as "one of the vital personal rights essential to the orderly pursuit of happiness by free men," the Court focused on the miscegenation statute before it. Mr. Chief Justice Warren stated:

> "Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival. *Skinner* v. *Oklahoma,* 316 U. S. 535, 541 (1942). See also *Maynard* v. *Hill,* 125 U. S. 190 (1888). To deny this fundamental freedom on so unsupportable a basis as the racial classifications embodied in these statutes, classifications so directly subversive of the principle of equality at the heart of the Fourteenth Amendment, is surely to deprive all the State's citizens of liberty without due process of law. The Fourteenth Amendment requires that the freedom of choice to marry not be restricted by invidious racial discriminations. Under our Constitution, the freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State." *Id.,* at 12.

Thus, *Loving* involved a denial of a "fundamental freedom" on a wholly unsupportable basis—the use of classifications "directly subversive of the principle of equality at the heart of the Fourteenth Amendment . . . ." It does not speak to the level of judicial scrutiny of, or governmental justification for, "supportable" restrictions on the "fundamental freedom" of individuals to marry or divorce.

In my view, analysis must start from the recognition of domestic relations as "an area that has long been regarded as a virtually exclusive province of the States." *Sosna* v. *Iowa,* 419 U. S. 393, 404 (1975). The marriage relation traditionally has been subject to regulation, initially by the ecclesiastical authorities, and later by the secular state. As early as

*Pennoyer* v. *Neff*, 95 U. S. 714, 734–735 (1878), this Court noted that a State "has absolute right to prescribe the conditions upon which the marriage relation between its own citizens shall be created, and the causes for which it may be dissolved." The State, representing the collective expression of moral aspirations, has an undeniable interest in ensuring that its rules of domestic relations reflect the widely held values of its people.

> "Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature. That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution." *Maynard* v. *Hill*, 125 U. S. 190, 205 (1888).

State regulation has included bans on incest, bigamy, and homosexuality, as well as various preconditions to marriage, such as blood tests. Likewise, a showing of fault on the part of one of the partners traditionally has been a prerequisite to the dissolution of an unsuccessful union. A "compelling state purpose" inquiry would cast doubt on the network of restrictions that the States have fashioned to govern marriage and divorce.

## II

State power over domestic relations is not without constitutional limits. The Due Process Clause requires a showing of justification "when the government intrudes on choices concerning family living arrangements" in a manner which is contrary to deeply rooted traditions. *Moore* v. *East Cleveland*, 431 U. S. 494, 499, 503–504 (1977) (plurality opinion). Cf. *Smith* v. *Organization of Foster Families*, 431 U. S. 816,

842–847 (1977). Due process constraints also limit the extent to which the State may monopolize the process of ordering certain human relationships while excluding the truly indigent from that process. *Boddie* v. *Connecticut,* 401 U. S. 371 (1971). Furthermore, under the Equal Protection Clause the means chosen by the State in this case must bear " 'a fair and substantial relation' " to the object of the legislation. *Reed* v. *Reed,* 404 U. S. 71, 76 (1971), quoting *Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415 (1920); *Craig* v. *Boren,* 429 U. S. 190, 210–211 (1976) (POWELL, J., concurring).

The Wisconsin measure in this case does not pass muster under either due process or equal protection standards. Appellant identifies three objectives which are supposedly furthered by the statute in question: (i) a counseling function; (ii) an incentive to satisfy outstanding support obligations; and (iii) a deterrent against incurring further obligations. The opinion of the Court amply demonstrates that the asserted counseling objective bears no relation to this statute. *Ante,* at 388–389. No further discussion is required here.

The so-called "collection device" rationale presents a somewhat more difficult question. I do not agree with the suggestion in the Court's opinion that a State may never condition the right to marry on satisfaction of existing support obligations simply because the State has alternative methods of compelling such payments. To the extent this restriction applies to persons who are able to make the required support payments but simply wish to shirk their moral and legal obligation, the Constitution interposes no bar to this additional collection mechanism. The vice inheres, not in the collection concept, but in the failure to make provision for those without the means to comply with child-support obligations. I draw support from Mr. Justice Harlan's opinion in *Boddie* v. *Connecticut.* In that case, the Court struck down filing fees for divorce actions as applied to those wholly unable to pay, holding "that a State may not, consistent with the obligations

imposed on it by the Due Process Clause of the Fourteenth Amendment, pre-empt the right to dissolve this legal relationship without affording all citizens access to the means it has prescribed for doing so." 401 U. S., at 383. The monopolization present in this case is total, for Wisconsin will not recognize foreign marriages that fail to conform to the requirements of § 245.10.[2]

The third justification, only obliquely advanced by appellant, is that the statute preserves the ability of marriage

---

[2] *Boddie* was an "as applied" challenge; it does not require invalidation of § 245.10 as unconstitutional on its face. In ordinary circumstances, the Court should merely require that Wisconsin permit those members of the appellee class to marry if they can demonstrate "the *bona fides* of [their] indigency," 401 U. S., at 382. The statute in question, however, does not contain a severability clause, and the Wisconsin Legislature has made specific provision for the contingency that "utilization of the procedures [under § 245.10 may be] stayed or enjoined by the order of any court." In the event of such a stay or injunction after February 1, 1978, 1977 Wis. Laws, ch. 105, § 3 (Wis. Stat. § 245.105 (3)), Wis. Legis. Serv. (West 1977), provides that "permission to remarry may likewise be granted to any petitioner who submits clear and convincing proof to the court that for reasonable cause he or she was not able to comply with a previous court obligation for child support."

The dissenting opinion of MR. JUSTICE REHNQUIST suggests that appellee may no longer be "incapable of discharging the arrearage as required by the support order and contributing sufficient funds in the future to remove his child from the welfare rolls." *Post*, at 410. There is no basis in the record for such speculation. The parties entered into a stipulation that as of August 1974, a month before appellee was denied a marriage license, appellee "was unemployed and indigent and unable to pay any sum for support of his issue." App. 21. In its opinion dated August 31, 1976, the District Court noted that "[i]n Redhail's case, because of his poverty he has been unable to satisfy the support obligation ordered in the paternity action, and, hence, a state court could not grant him permission to marry." 418 F. Supp. 1061, 1070 (ED Wis.). Appellant has not challenged the factual predicate of the trial court's determination, or even intimated that appellee's financial situation has improved materially. Such matters, of course, may be inquired into by the local court pursuant to the new procedures that will go into effect after February 1, 1978.

applicants to support their prior issue by preventing them from incurring new obligations. The challenged provisions of § 245.10 are so grossly underinclusive with respect to this objective, given the many ways that additional financial obligations may be incurred by the applicant quite apart from a contemplated marriage, that the classification "does not bear a fair and substantial relation to the object of the legislation." *Craig* v. *Boren, supra,.* at 211 (POWELL, J., concurring). See *Eisenstadt* v. *Baird,* 405 U. S. 438, 447–450 (1972); cf. *Moore* v. *East Cleveland,* 431 U. S., at 499–500 (plurality opinion).

The marriage applicant is required by the Wisconsin statute not only to submit proof of compliance with his support obligation, but also to demonstrate—in some unspecified way— that his children "are not then and are not likely thereafter to become public charges." [3]   This statute does more than simply "fail to alleviate the consequences of differences in economic circumstances that exist wholly apart from any state action." *Griffin* v. *Illinois,* 351 U. S. 12, 34 (1956) (Harlan, J., dissenting). It tells the truly indigent, whether they have met their support obligations or not, that they may not marry so long as their children are public charges or there is a danger that their children might go on public assistance in the future.[4]   Apparently, no other jurisdiction has embraced this approach as a method of reducing the number of children on public assistance. Because the State has not established a justification for

---

[3] The plaintiff in the companion case, *Leipzig* v. *Pallamolla,* 418 F. Supp. 1073 (ED Wis. 1976), had complied with his support obligations but was denied permission to marry because his four minor children received welfare benefits.

[4] Quite apart from any impact on the truly indigent, the statute appears to "confer upon [the judge] a license for arbitrary procedure," *Kent* v. *United States,* 383 U. S. 541, 553 (1966), in the determination of whether an applicant's children are "likely thereafter to become public charges." A serious question of procedural due process is raised by this feature of standardless discretion, particularly in light of the hazards of prediction in this area.

this unprecedented foreclosure of marriage to many of its citizens solely because of their indigency, I concur in the judgment of the Court.

MR. JUSTICE STEVENS, concurring in the judgment.

Because of the tension between some of the language in MR. JUSTICE MARSHALL's opinion for the Court and the Court's unanimous holding in *Califano* v. *Jobst, ante,* p. 47, a further exposition of the reasons why the Wisconsin statute offends the Equal Protection Clause of the Fourteenth Amendment is necessary.

When a State allocates benefits or burdens, it may have valid reasons for treating married and unmarried persons differently. Classification based on marital status has been an accepted characteristic of tax legislation, Selective Service rules, and Social Security regulations. As cases like *Jobst* demonstrate, such laws may "significantly interfere with decisions to enter into the marital relationship." *Ante,* at 386. That kind of interference, however, is not a sufficient reason for invalidating every law reflecting a legislative judgment that there are relevant differences between married persons as a class and unmarried persons as a class.[1]

A classification based on marital status is fundamentally

---

[1] In *Jobst,* we pointed out that "it was rational for Congress to assume that marital status is a relevant test of probable dependency . . . ." We had explained:

"Both tradition and common experience support the conclusion that marriage is an event which normally marks an important change in economic status. Traditionally, the event not only creates a new family with attendant new responsibilities, but also modifies the pre-existing relationships between the bride and groom and their respective families. Frequently, of course, financial independence and marriage do not go hand in hand. Nevertheless, there can be no question about the validity of the assumption that a married person is less likely to be dependent on his parents for support than one who is unmarried." *Ante,* at 53.

different from a classification which determines who may lawfully enter into the marriage relationship.[2] The individual's interest in making the marriage decision independently is sufficiently important to merit special constitutional protection. See *Whalen* v. *Roe,* 429 U. S. 589, 599–600. It is not, however, an interest which is constitutionally immune from evenhanded regulation. Thus, laws prohibiting marriage to a child, a close relative, or a person afflicted with venereal disease, are unchallenged even though they "interfere directly and substantially with the right to marry." *Ante,* at 387. This Wisconsin statute has a different character.

Under this statute, a person's economic status may determine his eligibility to enter into a lawful marriage. A noncustodial parent whose children are "public charges" may not marry even if he has met his court-ordered obligations.[3] Thus, within the class of parents who have fulfilled their court-ordered obligations, the rich may marry and the poor may not. This type of statutory discrimination is, I believe, totally unprecedented,[4] as well as inconsistent with our tradition of administering justice equally to the rich and to the poor.[5]

The statute appears to reflect a legislative judgment that persons who have demonstrated an inability to support their offspring should not be permitted to marry and thereafter to

[2] *Jobst* is in the former category; *Loving* v. *Virginia,* 388 U. S. 1, is in the latter.

[3] As MR. JUSTICE POWELL demonstrates, a constitutional defect in this provision invalidates the entire statute. *Ante,* at 401 n. 2.

[4] The economic aspects of a prospective marriage are unquestionably relevant to almost every individual's marriage decision. But I know of no other state statute that denies the individual marriage partners the right to assess the financial consequences of their decision independently. I seriously question whether any limitation on the right to marry may be predicated on economic status, but that question need not be answered in this case.

[5] This tradition explains why each member of the federal judiciary has sworn or affirmed that he will "do equal right to the poor and to the rich . . . ." See 28 U. S. C. § 453.

bring additional children into the world.[6]  Even putting to one side the growing number of childless marriages and the burgeoning number of children born out of wedlock, that sort of reasoning cannot justify this deliberate discrimination against the poor.

The statute prevents impoverished parents from marrying even though their intended spouses are economically independent.  Presumably, the Wisconsin Legislature assumed (a) that only fathers would be affected by the legislation, and (b) that they would never marry employed women.  The first assumption ignores the fact that fathers are sometimes awarded custody,[7] and the second ignores the composition of today's work force.[8]  To the extent that the statute denies a hard-pressed parent any opportunity to prove that an intended marriage will ease rather than aggravate his financial straits, it not only rests on unreliable premises, but also defeats its own objectives.

These questionable assumptions also explain why this statutory blunderbuss is wide of the target in another respect.  The prohibition on marriage applies to the noncustodial parent but allows the parent who has custody to marry without the State's leave.  Yet the danger that new children will further strain

---

[6] The "public charge" provision, which falls on parents who have faithfully met their obligations, but who are unable to pay enough to remove their children from the welfare rolls, obviously cannot be justified by a state interest in assuring the payment of child support.  And, of course, it would be absurd for the State to contend that an interest in providing paternalistic counseling supports a total ban on marriage.

[7] The Wisconsin Legislature has itself provided:

"In determining the parent with whom a child shall remain, the court shall consider all facts in the best interest of the child and shall not prefer one parent over the other solely on the basis of the sex of the parent." Wis. Stat. § 247.24 (3) (1977).

[8] Plainly, both of these assumptions are the product of a habitual way of thinking about male and female roles "rather than analysis or actual reflection."  See *Califano* v. *Goldfarb,* 430 U. S. 199, 222 (STEVENS, J., concurring in judgment).

an inadequate budget is equally great for custodial and non-custodial parents, unless one assumes (a) that only mothers will ever have custody and (b) that they will never marry unemployed men.

Characteristically, this law fails to regulate the marriages of those parents who are least likely to be able to afford another family, for it applies only to parents under a court order to support their children. Wis. Stat. § 245.10 (1) (1973). The very poorest parents are unlikely to be the objects of support orders.[9] If the State meant to prevent the marriage of those who have demonstrated their inability to provide for children, it overlooked the most obvious targets of legislative concern.

In sum, the public-charge provision is either futile or perverse insofar as it applies to childless couples, couples who will have illegitimate children if they are forbidden to marry, couples whose economic status will be improved by marriage, and couples who are so poor that the marriage will have no impact on the welfare status of their children in any event. Even assuming that the right to marry may sometimes be denied on economic grounds, this clumsy and deliberate legislative discrimination between the rich and the poor is irrational in so many ways that it cannot withstand scrutiny under the Equal Protection Clause of the Fourteenth Amendment.[10]

---

[9] Although Wisconsin precedents are scarce, the State's courts seem to follow the general rule that child-support orders are heavily influenced by the parent's ability to pay. See H. Clark, Law of Domestic Relations 496 (1968); see also *Miller* v. *Miller*, 67 Wis. 2d 435, 227 N. W. 2d 626 (1975). A parent who is so disabled that he will never earn enough to pay child support is unlikely to be sued, and a court order is unlikely to be granted. Cf. *Ponath* v. *Hedrick*, 22 Wis. 2d 382, 126 N. W. 2d 28 (1964) (social security benefits not to be included in determining relative's ability to make support payments).

[10] Neither the fact that the appellee's interest is constitutionally protected, nor the fact that the classification is based on economic status is sufficient to justify a "level of scrutiny" so strict that a holding of unconstitutionality is virtually foreordained. On the other hand, the presence of these factors precludes a holding that a rational expectation of occasional and random

MR. JUSTICE REHNQUIST, dissenting.

I substantially agree with my Brother POWELL's reasons for rejecting the Court's conclusion that marriage is the sort of "fundamental right" which must invariably trigger the strictest judicial scrutiny. I disagree with his imposition of an "intermediate" standard of review, which leads him to conclude that the statute, though generally valid as an "additional collection mechanism" offends the Constitution by its "failure to make provision for those without the means to comply with child-support obligations." *Ante,* at 400. For similar reasons, I disagree with my Brother STEWART's conclusion that the statute is invalid for its failure to exempt those persons who "simply cannot afford to meet the statute's financial requirements." *Ante,* at 394. I would view this legislative judgment in the light of the traditional presumption of validity. I think that under the Equal Protection Clause the statute need pass only the "rational basis test," *Dandridge* v. *Williams,* 397 U. S. 471, 485 (1970), and that under the Due Process Clause it need only be shown that it bears a rational relation to a constitutionally permissible objective, *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 491 (1955); *Ferguson* v. *Skrupa,* 372 U. S. 726, 733 (1963) (Harlan, J., concurring). The statute so viewed is a permissible exercise of the State's power to regulate family life and to assure the support of minor children, despite its possible imprecision in the extreme cases envisioned in the concurring opinions.

Earlier this Term the traditional standard of review was applied in *Califano* v. *Jobst, ante,* p. 47, despite the claim that the statute there in question burdened the exercise of the right to marry. The extreme situation considered there involved a permanently disabled appellee whose benefits under the Social Security Act had been terminated because of his

benefit is sufficient to demonstrate compliance with the constitutional command to govern impartially. See *Craig* v. *Boren,* 429 U. S. 190, 211 (STEVENS, J., concurring).

marriage to an equally disabled woman who was not, however, a beneficiary under the Act. This Court recognized that Congress, in granting the original benefit, could reasonably assume that a disabled adult child remained dependent upon his parents for support. The Court concluded that, upon a beneficiary's marriage, Congress could terminate his benefits, because "there can be no question about the validity of the assumption that a married person is less likely to be dependent on his parents for support than one who is unmarried." *Ante,* at 53. Although that assumption had been proved false as applied in that individual case, the statute was nevertheless rational. "The broad legislative classification must be judged by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples." *Ante,* at 55.

The analysis applied in *Jobst* is equally applicable here. Here, too, the Wisconsin Legislature has "adopted this rule in the course of constructing a complex social welfare system that necessarily deals with the intimacies of family life." *Ante,* at 54 n. 11. Because of the limited amount of funds available for the support of needy children, the State has an exceptionally strong interest in securing as much support as their parents are able to pay. Nor does the extent of the burden imposed by this statute so differentiate it from that considered in *Jobst* as to warrant a different result. In the case of some applicants, this statute makes the proposed marriage legally impossible for financial reasons; in a similar number of extreme cases, the Social Security Act makes the proposed marriage practically impossible for the same reasons. I cannot conclude that such a difference justifies the application of a heightened standard of review to the statute in question here. In short, I conclude that the statute, despite its imperfections, is sufficiently rational to satisfy the demands of the Fourteenth Amendment.

Two of the opinions concurring in the judgment seem to agree that the statute is sufficiently rational except as applied to the truly indigent. *Ante,* at 394 (STEWART, J.); *ante,* at

400 (Powell, J.). Under this view, the statute could, I suppose, be constitutionally applied to forbid the marriages of those applicants who had willfully failed to contribute so much as was in their means to the support of their dependent children. Even were I to agree that a statute based upon generally valid assumptions could be struck down on the basis of "selected, atypical examples," *Jobst, ante,* at 55, I could not concur in the judgment of the Court, because there has been no showing that this appellee is so truly indigent that the State could not refuse to sanction his marriage.

Under well-established rules of standing, a litigant may assert the invalidity of a statute only as applied in his case. "[A] person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in situations not before the Court." *Broadrick* v. *Oklahoma,* 413 U. S. 601, 610 (1973). See also *Barrows* v. *Jackson,* 346 U. S. 249, 256–257 (1953). We have made a limited exception to this rule in cases arising under the First Amendment, allowing the invalidation of facially overbroad statutes to guard against a chilling effect on the exercise of constitutionally protected free speech. See, *e. g., Coates* v. *Cincinnati,* 402 U. S. 611 (1971). But no claim based on the First Amendment is or could be made by this appellee.

Appellee's standing to contest the validity of the statute as applied to him must be considered on the basis of the facts as stipulated before the District Court. The State conceded, without requiring proof, that "[f]rom May of 1972 until August of 1974, [appellee] was unemployed and indigent and unable to pay any sum for support of his issue." App. 21. There is no stipulation in this record that appellee was indigent at the time he was denied a marriage license on September 30, 1974, or that he was indigent at the time he filed his complaint on December 24, 1974, or that he was indigent at the time the District Court rendered its judgment on August 31, 1976. All we know of his more recent financial

condition is his counsel's concession at oral argument that appellee had married in Illinois, Tr. of Oral Arg. 23, clearly demonstrating that he knows how to obtain funds for a purpose which he deems sufficiently important. On these inartfully stipulated facts, it cannot be said, even now, that this appellee is incapable of discharging the arrearage as required by the support order and contributing sufficient funds in the future to remove his child from the welfare rolls. Therefore, even under the view taken by the opinions concurring in the judgment, appellee has not shown that this statute is unconstitutional as applied to him.

Because of my conclusion that the statute is valid despite its possible application to the truly indigent, I need not determine whether the named appellee's failure to establish his indigency should preclude this Court from granting injunctive relief to the indigent members of the class which appellee purports to represent.* Our decisions have demonstrated that, where the claim of the named representative has become moot, this Court is not bound to dismiss the action but may consider a variety of factors in determining whether to proceed. See generally *Kremens* v. *Bartley,* 431 U. S. 119, 129–135 (1977). It has never been explicitly determined whether

---

*Ordinarily, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *East Texas Motor Freight* v. *Rodriguez,* 431 U. S. 395, 403 (1977), quoting *Schlesinger* v. *Reservists Committee to Stop the War,* 418 U. S. 208, 216 (1974). At least where the issue is properly raised, an appellate court may consider the representative's failure to establish his own claim in determining whether a class action may be maintained. See, *e. g.,* *Donaldson* v. *Pillsbury Co.,* 554 F. 2d 825, 831–832, n. 5 (CA8 1977); cf. *East Texas, supra,* at 406 n. 12. In some instances, the court may eliminate from the class those persons whom the named plaintiff may not adequately represent. *La Mar* v. *H & B Novelty & Loan Co.,* 489 F. 2d 461 (CA9 1973). In this case, such an approach could require the dismissal of the class action altogether, since appellee can represent no one with a valid claim. The State, however, has inexplicably failed to challenge the certification of the plaintiff class, either here or in the trial court.

similar considerations apply where the named representative never had a valid claim of his own. But see *Allee* v. *Medrano,* 416 U. S. 802, 828–829, and n. 4 (1974) (BURGER, C. J., concurring and dissenting). In light of my view on the merits, I am content to save this question for another day.

I would reverse the judgment of the District Court.