**Rita WOLFORD, Plaintiff,**

v.

**Ron ANGELONE, et al., Defendants.**

**Civil Action No. 98–0085–A.**

United States District Court,
W.D. Virginia,
Abingdon Division.

Jan. 27, 1999.

---

Susan Debra Oglebay, Kobak & Oglebay, Pound, VA, for Plaintiff.

Guy Winston Horsley, Jr., Office of Atty. Gen., Richmond, for Defendants.

## OPINION

JONES, District Judge.

The question here is whether a state prison guard who married a convicted felon, the father of her child, and thus forfeited her job for violating a regulation against fraternization with inmates of the state prison system, is entitled to relief in federal court. Finding that the anti-fraternization policy is a valid regulation of prison administration and consequently provides only an indirect restriction on marriage, I hold that neither the plaintiff's fundamental right to marry nor her First Amendment right to association have been violated.

### I. Background.

The plaintiff, Rita Wolford, filed this action seeking monetary and other relief pursuant to 42 U.S.C.A. § 1983 (West 1994 & Supp.1998) against employees and board members of the Virginia Department of Corrections ("DOC"), who are sued individually and in their official capacities. Jurisdiction in this court is proper pursuant to 28 U.S.C.A. § 1343 (West 1993 & Supp.1998).

In her complaint, Wolford alleges that her forced resignation as a correctional officer at the Keene Mountain Correctional Center ("KMCC") was procured by the enforcement of a DOC regulation that mandated discharge for employees married to inmates in the state prison system. As such, Wolford asserts that the regulation is a violation of her freedom of association under the First Amendment and her fundamental right to marry under the Fourteenth Amendment to the Constitution.

Wolford seeks reinstatement to her former position, compensatory damages, and injunctive relief against future use of the regulation to prohibit marriages.

In their response to the suit, the defendants assert that (1) the plaintiff has waived any claim against defendants by her voluntary resignation and related failure to utilize the grievance procedure; and (2) the plaintiff's constitutional right to marry has not been violated because "the prohibition against correctional officers from associating with or marrying convicted felons is legitimate and furthers important state interests." (Defs.' Answer and Grounds of Defense, June 22, 1998, at 3, ¶ 4.)

The defendants subsequently moved for summary judgment with an affidavit and supporting exhibits. In support of their motion, the defendants contend first, that Wolford has waived any claim of right to continued employment by resigning voluntarily from her job. Second, even if Wolford can assert a claim for deprivation of a

property interest under the Fourteenth Amendment, the defendants further contend that the DOC policy prohibiting fraternization with inmates does not violate Wolford's fundamental right to marry as alleged. As constructed and applied to prison administration, the defendants argue that the anti-fraternization policy does not directly and substantially interfere with the right to marry and passes rational basis scrutiny. Third, the defendants assert that Wolford's claim for violation of her freedom of association under the First Amendment is analyzed under the same standard of review as her Fourteenth Amendment claim and likewise fails for the same reasons. Fourth and finally, as for the plaintiff's claim for damages against the individually-named defendants, the defendants assert that they are entitled to qualified immunity from money damages.

Wolford has responded in opposition to the defendants' motion for summary judgment. Both sides having briefed their arguments and supplied all supporting documentation for the record, the issues are now ripe for decision.

## II. Facts.

Wolford was employed by DOC as a correctional officer at the KMCC facility from November 1, 1992, until April 23, 1997, the date of her resignation. The defendant Ron Angelone is the director of DOC, and the defendants George E. Deeds, warden of KMCC, and Daniel Braxton, assistant warden of KMCC, were employed by DOC in their respective capacities at all times relevant to the plaintiff's complaint. The remaining named defendants are members of the Virginia Board of Corrections.[1]

Shortly after she was hired, Wolford received a copy of DOC rule 5–22, captioned "Rules of Conduct Governing Employees' Relationships with Inmates, Probationers, or Parolees." She also received a copy of the "Standards of Conduct for State Employees."

Included in part two of the material on rule 5–22 is the policy governing "improprieties." (Defs.' Mem. at Enclosure I, Ex. B.) As such, rule 5–22.7 states, in pertinent part,

*Improprieties.* Improprieties or the appearance of improprieties, fraternization, or other non-professional association by and between employees and inmates, probationers, or parolees or families of inmates, probationers, or parolees shall be discouraged. Associations between staff and inmates, probationers, or parolees which may compromise security or which undermine the employee's effectiveness to carry out his responsibilities may be treated as a Group III offense under the Standards of Conduct and Performance (Procedure 5–10).

(*Id.*) The referenced "Group III offenses" are explained in the "Standards of Conduct," where they are described to "include acts and behavior of such a serious nature that a first occurrence should normally warrant removal." (Defs.' Mem. at Enclosure I, Ex. D.)

Approximately three years after she was hired, Wolford began living with James Wolford, and in June of 1996, the couple "conceived a child." (Pl.'s Compl. at 5, ¶¶ 7, 9.) On January 7, 1997, James Wolford was convicted of multiple felony and misdemeanor offenses for which he received a total sentence of over three years imprisonment. At the time of her husband's conviction Wolford was on maternity leave from her employment with KMCC. Wolford alleges that at some point she contacted her supervisor, Major Mathena, concerning the conviction of James Wolford and claims that Mathena told her things would look "differently and might be different" for Wolford if she and her husband were married.

On February 14, 1997, the plaintiff was married to James Wolford. James Wolford was incarcerated on April 3, 1997, and has remained incarcerated since. He is

---

1. The defendants deny that Barbara L. Fel-    lows is a member of the board.

currently serving his sentence at the Wise Correctional Unit No. 18, a facility operated by DOC.

The plaintiff returned to work on April 19, 1997, following her period of maternity leave, her marriage, and the incarceration of her husband. On April 23, 1997, she was interviewed first by a state investigator, ostensibly concerning her relationship with her husband, and then by assistant warden Braxton. According to Wolford, Braxton told her that she could "either quit or be discharged," (Pl.'s Compl. at 6, ¶ 14). The defendants deny that such an ultimatum was given. Later that day, Wolford tendered her resignation, in the form of a signed, hand-written declaration which stated, "I, Rita Kay Wolford, am turning in my resignation, effective April 23, 1997 due to personal reasons." (Defs.' Mem. at Enclosure I, Ex. F.) Wolford argues that she was "terminated form her employment for 'improprieties with someone who was a convicted felon . . . ,' allegedly a Group III offense." (Pl.'s Compl. at 6, ¶ 15.)

Although Wolford attempted to utilized the DOC grievance procedure, it was determined that the matter was nongrievable, as DOC deemed Wolford to have tendered her resignation voluntarily.

This action followed.

### III. Analysis.

#### A. Summary Judgment Standard.

A district court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A moving party is entitled to summary judgment if the nonmoving party has "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

#### B. Effect of Plaintiff's Resignation.

The defendants first contend that the plaintiff's case is barred because she voluntarily resigned from her position. The Fourth Circuit follows the well-established rule that "in order to claim entitlement to the protections of the due process clause-either substantive or procedural-a plaintiff must first show that he has a constitutionally protected 'liberty' or 'property' interest, and that he has been 'deprived' of that protected interest by some form of 'state action.'" Stone v. University of Maryland Medical System Corp., 855 F.2d 167, 172 (4th Cir.1988) (citations omitted). Because there is no doubt but that Wolford had a constitutionally protected "property" interest in her continued employment with DOC, as she could be discharged from her position only for cause, the only question left for dispute is whether she was "deprived" of that interest by some form of state action. See id. at 172–73.

■ An instance of resignation, in contrast to a "firing," presents a special case within which to analyze the deprivation of a property interest. Only if an employee's resignation rises to the level of a constructive discharge will it be considered a deprivation by state action triggering the protections of the due process clause. See id. at 173. The key analytic element in this context is voluntariness. Therefore, the Fourth Circuit holds that where an employee "resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that the state 'deprived' him of it within the meaning of the due process clause." Id. On the other hand, where a "'resignation' was so involuntary that it amounted to a constructive discharge, it must be considered a deprivation by state action triggering the protections of the due process clause." Id.

With the focus of the constitutional inquiry thus set on the voluntariness of Wolford's resignation, I note as the Fourth

Circuit did in *Stone* that "[t]he answer to that factual inquiry is dispositive of the constitutional 'deprivation' issue, and potentially of the constitutional claim." *Id.*

■ To see if an employee freely chose to resign, I must examine the surrounding circumstances. *See id.* Based on the circumstances of the resignation, an employee's resignation may be found involuntary in two situations: first, where it has been coerced or is a product of duress; and second, where the employee resigns due to the employer's deception or misrepresentation of a material fact. *See id.* at 174.

Wolford has not presented sufficient evidence to indicate that her resignation was induced by reasonable reliance upon the defendants' misrepresentation of a material fact as required by the Fourth Circuit. *See id.* In her complaint, Wolford states that while on maternity leave from her employment she contacted her supervisor, Major Mathena, concerning the conviction of James Wolford, the father of her then-unborn child. According to Wolford, Mathena advised Wolford that "things would look 'differently and might be different' for [her] if she married Mr. Wolford." (Pl.'s Compl. at 5, ¶ 11.) As the plaintiff alleges, she then married James Wolford on February 14, 1997, acting at least in part upon her supervisor's advice.

■ For the purpose of finding a constructive discharge under the misrepresentation theory, "[a] misrepresentation is material if it concerns either the consequences of the resignation or the alternative to resignation." *Stone*, 855 F.2d at 174 (citations omitted). Although the al-

leged statement by assistant warden Braxton that Wolford could "quit or be discharged" did not fully state the circumstances of the discharge alternative (namely, the availability of the grievance procedure), that simple statement, if true, does not in and of itself amount to a material misrepresentation in this case.

■ Wolford's allegations concerning her interaction with Major Mathena more aptly present a claim of fraud in the inducement, rather than misrepresentation of the consequences or alternatives to resignation. As the defendants note in their answer to Wolford's complaint, however, the act of getting married itself was immaterial to the offense charged. According to the defendants, "[l]iving with and/or marrying a convicted felon is an impropriety for a corrections officer." (Defs.' Answer at 2, ¶ 10.) Under this reading, Wolford's decision to marry a convicted felon was a moot point, as she was already subject to termination for her cohabitation with him.[2] Consequently, even if Wolford could be seen to have been induced to marry, she was not induced to violate the DOC regulations at issue. Therefore, the "misrepresentation" theory of constructive discharge does not apply to this case.

■ Under the "duress/coercion" theory, the *Stone* court held that "a resignation may be found involuntary if on the totality of circumstances it appears that the employer's conduct in requesting resignation effectively deprived the employee of free choice in the matter." *Id.* Deprivation of free choice is thus determined by considering the following factors:

---

**2.** Apparently the defendants take the position that a "convicted felon" falls into one of the three categories of persons covered by the provisions of DOC rule 5–22.7; namely, inmates, probationers, or parolees. It is possible, however, to be a convicted felon and neither an inmate nor a probationer nor a parolee. In such an instance, a DOC employee's fraternization would not qualify as a prohibited impropriety under rule 5–22.7.

It is clear in this case, however, that Wolford's fraternization was covered by rule 5–

22.7. The plaintiff married James Wolford on February 14, 1997. James Wolford was incarcerated as a convicted felon on April 3, 1997. The plaintiff resigned on April 23, 1997, after being confronted with her violation of rule 5–22.7. This sequence of events makes clear that Wolford's violation of rule 5–22.7 was attributable to her status as an employee married to an inmate of a state correctional facility.

(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation.

*Id.* A fifth and final factor to consider is whether the employee could obtain advice from counsel. *Id.* at 177.

■ In applying this totality of the circumstances test, I note that the assessment of whether real alternatives to resignation were offered must be gauged by an objective standard and not that of the employee's subjective perception at the time. As the court noted in *Stone,*

> that the employee may perceive his only option to be resignation ... is irrelevant. Similarly, the mere fact that the choice is between comparably unpleasant alternatives-e.g., a resignation or facing disciplinary charges-does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary. This is so even where the only alternative to resignation is facing possible termination for cause, unless the employer actually lacked good cause to believe that grounds for termination existed.

*Id.* (citations omitted). In this regard it has also been said that "a resignation resulting from a choice between resigning or facing proceedings for dismissal is not tantamount to discharge by coercion ... if the employee is given sufficient time and opportunity for deliberation of the choice posed." *Dusanek v. Hannon,* 677 F.2d 538, 543 (7th Cir.1982); *see also Stone,* 855 F.2d at 177–78 (noting as evidence that a resignation was voluntary, the plaintiff doctor's engagement in protracted negotiations concerning the terms and conditions of his resignation and his receipt of a regular salary for almost a year after his requested resignation).

■ In this case, Wolford alleges that on April 23, 1997, just days after returning from maternity leave during which time she had married James Wolford, she was interviewed by a state investigator. Later that day, Wolford alleges that she was "summonsed to the office of the Assistant Warden Braxton, who advised her that she could either quit or be discharged." (Pl.'s Compl., May 29, 1998, at 6, ¶ 14.) As a result, Wolford "quit her employment." (Pl.'s Resp., Nov. 17, 1998, at 2.)

In light of the circumstances of her resignation, Wolford contends that, "[p]er Assistant Warden Braxton, [she] was *terminated* from her employment for 'improprieties with someone who was a convicted felon ...,' allegedly a Group III offense." (Pl.'s Compl. at 6, ¶ 15 (emphasis added).) Wolford alleges that no personnel materials ever furnished to her as an employee, including the "Standards of Conduct booklet," enumerated the alleged offense of "improprieties" with a convicted felon. (Pl.'s Compl. at 6, ¶¶ 15–16.)

In response, defendants admit that on April 23, 1997, Wolford was interviewed by a state investigator, then summoned to assistant warden Braxton's office, and subsequently resigned from her employment. (Defs.' Answer, June 22, 1998, at 2, ¶¶ 7–8.) The defendants deny, however, that a "quit or be discharged" ultimatum was given the plaintiff. (Defs.' Answer at 2, ¶ 8.) According to Wolford's hand-written resignation, appended to defendants' pleadings as an exhibit, she turned in her "[r]esignation, effective April 23, 1997 due to personal reasons."

Citing the plaintiff's receipt of DOC policy 5–22 and "Standards of Conduct for State Employees," the defendants note that "[d]espite her allegations to the contrary, Plaintiff knew or should have known of DOC's prohibition against fraternization with an inmate" and that such fraternization would be treated as a Group III offense warranting termination. (Defs.' Mem. at 4, ¶ 1.)

In this case, I must look at the totality of the circumstances and apply an objec-

tive analysis. First, it is without dispute that Wolford was given a clear alternative to resignation. The *manner* in which that alternative was to occur, however, was not necessarily understood. Certainly receipt of policies and standards of conduct put an employee on notice that those standards and policies will be enforced. The alleged actions of the defendants and their agents at the time, however, leave one to question whether Wolford understood that she was to receive the process due her under DOC regulations. For example, Wolford. does not indicate whether she understood at the time that a grievance procedure was still available to her under the circumstances. Such a misperception is decidedly reasonable under the circumstances. As DOC regulations state, violations of rule 5–22.7 "*may* be treated as a Group III offense" and Group III offenses "*normally* warrant removal." If indeed assistant warden Braxton gave the "resign or be discharged" ultimatum as alleged, it would appear from an objective viewpoint that Braxton himself had already performed the tasks of judge and jury. With management's decision seemingly already made from the objective employee's perspective, the alternative was no longer resign or face likely termination pursuant to the grievance procedure-a choice between "comparably unpleasant alternatives" in the lexicon of the Fourth Circuit. In sum, under the *Stone* totality of the circumstances test, it is unclear whether Wolford understood the nature of the choice given to her.

That Wolford might have been denied the opportunity to make a free choice in this case also seems possible considering that her resignation was tendered on the same day that she was interviewed by both the state investigator and the assistant warden. On the facts presented, it is unclear whether this represents sufficient time and opportunity for deliberation on Wolford's part. Moreover, at no time during her interaction with the defendants or their agents on April 23, 1997, was the plaintiff represented by counsel, nor is it clear that she had the opportunity to avail herself of that benefit under the circumstances.

In light of the above, I hold that the plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether the plaintiff's resignation was involuntary and obtained by coercion or duress, thus amounting to a constructive discharge. The defendants' request for summary judgment on this basis will accordingly be denied.

## C. Fundamental Right to Marry.

It is well-settled law that the Constitution embraces a fundamental right to marry. *See Waters v. Gaston County*, 57 F.3d 422, 425 (4th Cir.1995) (citing *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967)). The Supreme Court recognized the limitations of this right, however, in *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). While invalidating a Wisconsin statute that required non-custodial parents with child support obligations to obtain leave of court before getting married, the Court held that "not every restriction on the right to marry violated the Constitution; rather 'reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may be legitimately imposed.'" *Waters*, 57 F.3d at 425 (quoting *Zablocki*, 434 U.S. at 386–87, 98 S.Ct. 673). The test which emerged from the Court's decision to determine whether the fundamental right to marry was implicated sufficiently to require strict scrutiny was whether the regulation(s) "interfere directly and substantially with the right to marry." *Id.* As the Fourth Circuit noted in *Waters*, "[i]n essence ... we should apply strict scrutiny only to regulations that 'significantly interfere' with the right to marry." *Id.*

The regulations in *Waters* involved antinepotism ordinances prohibiting employment of relatives by Gaston County, North Carolina. *See id.* at 424. Noting that the county's policy was a "work-related re-

striction" with merely "incident effects" on marriage, the court held that the anti-nepotism ordinances did not "directly and substantially" interfere with the right to marry. *Id.* at 426. To function as a direct and substantial interference the court stated that the policies in question would essentially have to prevent those who wish to marry from doing so. *Id.* But, in contrast to polices which "forbid marriage altogether (as in *Loving*) or forbid it without permission of the state (as in *Zablocki*)," the anti-nepotism ordinances in *Waters* presented at most an "unwelcome hurdle, forcing one spouse to attempt to transfer to another department within the County or to leave the County's employ altogether." *Id.* In light of this analysis, the court held that the policies in question did not sufficiently impact a fundamental right so as to trigger strict scrutiny. *Id.*

In this regard, the Fourth Circuit's treatment of Fourteenth Amendment challenges to anti-nepotism laws is consistent with that of other circuits which have addressed the question. *Id.* at 425. *See, e.g., Wright v. MetroHealth Medical Center,* 58 F.3d 1130, 1135–36 (6th Cir.1995); *Parks v. City of Warner Robins,* 43 F.3d 609, 614 (11th Cir.1995); *Sebetic v. Hagerty,* 640 F.Supp. 1274, 1277–78 (E.D.Wis. 1986), *aff'd sub nom. Heyden v. Schoenfeld,* 819 F.2d 1144 (7th Cir.1987); *Parsons v. County of Del Norte,* 728 F.2d 1234, 1237 (9th Cir.1984); *Cutts v. Fowler,* 692 F.2d 138, 141 (D.C.Cir.1982); *Keckeisen v. Independent School District 612,* 509 F.2d 1062, 1065 (8th Cir.1975).

Anti-nepotism and anti-fraternization policies were adjudged to be comparable by the Seventh Circuit in *Keeney v. Heath,* 57 F.3d 579, 582 (7th Cir.1995). Further-more, this circuit has denied the application of strict scrutiny to other work place regulations. *See, e.g., Austin v. Berryman,* 862 F.2d 1050, 1054–55 (4th Cir.1988) (holding that rational basis review and not strict scrutiny was appropriate to review the denial of unemployment benefits to a wife who quit her job, thus making her ineligible for benefits under state statute, so she could follow her husband to a new locality). In sum, most anti-nepotism, anti-fraternization, and work place regulations will fall among the "many state regulations affecting the marriage relationship that do not implicate constitutional concerns." *Id.*[3]

The question in this case, then, is whether the anti-fraternization policy at issue directly and substantially interfered with the plaintiff's right to marry. The rule in question, 5–22.7, is contained within the department's procedures manual and falls under chapter five regulating "employee relations and training." (Defs.' Mem. at Enclosure I, Ex. B.) The general subject under which rule 5–22.7 falls is titled "rules of conduct governing employees' relationships with inmates, probationers, or parolees." (*Id.*) As for the procedures outlined by rule 5–22.7, it broadly states that improprieties, the appearance of improprieties, fraternization, or other non-professional association are "discouraged" by and between employees and inmates, probationers, or parolees. (*Id.*) More specifically, the rule states that "[a]ssociations between staff and inmates, probationers, or parolees which may compromise security or which undermine the employee's effectiveness to carry out his responsibilities may be treated as a Group III offense

---

**3.** Summarizing the constitutional analysis and the limited availability of strict scrutiny, one commentator noted the following:

> [I]t appears that in order for there to be a significant interference on the right to marry a restriction on this right must absolutely prevent the marriage or create an insurmountable barrier to the altar .... strict scrutiny review is applied only when the legal recourse necessary to obtain a legally recognized marriage is absolutely barred or when a classification provides an arbitrary discrimination on certain individuals and their right to marry.

Melanie L. Jump, Note, *Wright v. Metrohealth Medical Center: Anti–Nepotism Policies Carve a Slice in the Fundamental Right to Marry–Is This the Wright or Wrong Decision?,* 28 U. Tol. L.Rev. 841, 855 (1997).

under the Standards of Conduct and Performance ..." (*Id.*) From this source of authority and this source alone, DOC asserts its right to discharge the plaintiff for her relationship with a convicted felon, James Wolford.

On these facts, and as was the case in the Seventh Circuit's consideration of the anti-fraternization regulation passed by the Indiana Department of Corrections in *Keeney,* 57 F.3d at 580, the defendants here have not directly and substantially interfered with the plaintiff's right to marry. That the facts of *Keeney* so closely resemble the case at bar is instructive. In *Keeney,* the former Nancy Summers (now Nancy Keeney), a prison guard in a county facility, became romantically attached to prisoner Mitch Keeney. *See id.* When questioned concerning her association with a prisoner, Summers admitted to the relationship and indicated her intention to marry him. *See id.* At that point, Summers' superior informed her that she must either "give up Mitch or give up her job, pursuant to a regulation of the jail forbidding employees to 'become involved socially with inmates in or out of the [jail].' " *Id.* Summers chose to resign and later sued her superior and the county sheriff under 42 U.S.C.A. § 1983, claiming that in "forcing her to choose between her job and marriage to the man of her choice, the defendants infringed her constitutional right to marry." *Id.*

The Seventh Circuit reviewed the district court's grant of summary judgment for the defendants and affirmed. *See id.* As Judge Posner noted in his opinion, the defendants did not forbid the plaintiff to marry, nor did they forbid her to marry a specific man; but they did "[make] it more costly for her to marry him, the cost being the loss of her job, or more precisely the loss of whatever margin made it a better job for her than any other that she could get." *Id.* Thus, although "the defendants undoubtedly burdened her right to marry," it was important to note that the effect of the prison regulation was not an outright

deterrence of the plaintiff's right to marriage. *Id.* Therefore, although some justification for a burden of this character is required, strict scrutiny is not required. *See id.*

I agree with the analysis in *Keeney* in the anti-fraternization context and those related cases which have addressed the impact of anti-nepotism laws on the right to marry. *See, e.g., Parks,* 43 F.3d at 614 (holding that "[a]ny increased economic burden created by the anti-nepotism policy is no more than an incidental effect of a policy aimed at maintaining the operational efficiency of Warner Robins' governmental departments, not a direct attempt to control the marital decision of city employees"); *Sebetic,* 640 F.Supp. at 1277–78 (holding that a "no spouse policy" did not significantly interfere with the right to marry because it was "a reasonable public-safety measure with minimal residual impact on the decision to marry" and did not "deter the plaintiffs themselves from getting married").

■ In this case, the effect of rule 5–22.7 on Wolford's right to marry was indirect and insubstantial. Rule 5–22.7 was passed in order to regulate work place relations and not marital relations. There is no reference made to marriage in the rule itself, which regulates all "associations" which might compromise employee performance and not just familial or marital ones. It is true that the effect of the regulation in this case is to treat marriage as an impropriety, as Wolford alleges, but that result is secondary to the primary goal of the anti-fraternization policy. Furthermore, Wolford did indeed marry her husband. The policy in question in no way hindered that choice. That Wolford lost her job as a result of her marriage to a convicted felon in the state penal system, of course, requires some justification, but not at the highest level of constitutional scrutiny. Were Wolford's employment opportunities completely foreclosed by the rule in question or had the defendants' regulations imposed absolute restrictions

on the right to marry so that the plaintiff was truly deterred, the result here would be different. That simply is not the case.

Therefore I hold that the anti-fraternization regulation in question is not subject to heightened scrutiny and instead review the policy to determine whether there was a rational basis for its passage. *See Waters,* 57 F.3d at 426.

In light of the area of regulation at issue here, I have little trouble concluding that the defendants' policy passes muster under a rational basis review. "As long as the concerns expressed by correctional authorities are plausible, and the burden that a challenged regulation of jail or prison security places on protected rights a light or moderate one, the courts should not interfere." *Keeney,* 57 F.3d at 581. *See Washington v. Harper,* 494 U.S. 210, 223–24, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990); *see also Wallace v. Hutto,* 80 F.R.D. 739, 741 (W.D.Va.1978) (holding that matters of prison administration warrant federal intervention only under "extraordinary circumstances"). Because the burden on the right to marry was indirect in this case, it qualifies as a light or moderate burden. As for the benefits, the defendants assert that "marriages between officers and inmates seriously compromise the integrity of the state's system-wide security practices." (Defs.' Mem. at 8, ¶ 6.) Rule 5–22.7 itself states that associations worthy of termination are those which compromise security or undermine employee effectiveness. That an employee's marriage to an inmate would be deemed to be just such an association is certainly rationally related to the defendants' legitimate goal of prison security. Further inquiry into the defendants' application of this regulation is not warranted on the facts and I will not entertain an invitation to do so.[4]

Therefore, I find that summary judgment is appropriate in this case on Wolford's claim for violation of her substantive due process. There is no genuine issue of material fact on the face of the pleadings, affidavits, and documents in the record to indicate that the DOC policy in question violated Wolford's fundamental right to marry as protected by the Fourteenth Amendment to the Constitution. The defendants are, therefore, entitled to judgment as a matter of law pursuant to Fed. R.Civ.P. 56(c).

### D. First Amendment Right of Intimate Association.

Wolford also asserts a claim against the defendants for violation of her First Amendment freedom of association, more aptly categorized as her freedom of intimate association. Under the First Amendment, the Supreme Court recognizes the "right to associate with others in pursuit of a wide variety of political, social, economic, education, religious, and cultural ends." *Roberts v. United States Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Included in this right of association is the right to enter into certain intimate or private relationships,

---

4. The plaintiff makes a passing reference in her brief's statement of facts to evidence of unequal application of the DOC's anti-fraternization policy. As Wolford admits in her complaint, however, although she attempted to grieve the matter through the administrative process, it was determined that "the matter was nongrievable, since she resigned rather than be terminated." (Pl.'s Compl. at 7, ¶ 18.) Consequently, the policy was never applied to her case. As a result, it may be assumed that Wolford has decided not to cast her claim as an equal protection violation under the Fourteenth Amendment.

I briefly note, however, that selective enforcement of a facially constitutional regulation does not, by itself, violate equal protection. *See Wayte v. United States,* 470 U.S. 598, 607–10, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). "A claim of selective application of a facially lawful state regulation requires a showing that ... the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *FSK Drug Corp. v. Perales,* 960 F.2d 6, 10 (2d Cir.1992). The plaintiff's case here makes no such claims.

such as family relationships. *See id.* at 619, 104 S.Ct. 3244 (naming marriage as an example of constitutionally protected intimate association).

The defendants correctly state in response that Wolford's First Amendment challenge to their anti-fraternization policy is subject to the same standard of review as her Fourteenth Amendment substantive due process claim. *See Parks,* 43 F.3d at 615 (holding that "[a]lthough the right to marry enjoys independent protection under both the First Amendment and the Due Process Clause, the Supreme Court has held that the same analysis applies in each context").

As the Eleventh Circuit noted in *Parks,* where a "policy does not 'order' individuals not to marry, nor ... 'directly and substantially' interfere with the right to marry," the plaintiff has failed to show that the regulation infringes on either the right to marry or the First Amendment right of intimate association. *Id.* at 616. I agree and find that just as the defendants' policy does not violate Wolford's fundamental right to marry, it neither violates her First Amendment right to intimate association. Similarly, the policy passes constitutional muster as it is rationally related to a legitimate governmental interest. Summary judgment is therefore also appropriate on this ground.

### *IV. Conclusion.*

In light of the foregoing, I find that summary judgment for the defendants is appropriate in this case. Assuming that the plaintiff has standing to raise her substantive due process claim, I find that no genuine issue of material fact exists concerning the constitutionality of the application of the defendants' anti-fraternization regulation to the plaintiff. Because the regulation does not directly and substantially interfere with plaintiff's right to marry, the policy is subject to rational basis review. Upon review, I find that the poli-

cy of discharging a state prison employee for her intimate association with an inmate is rationally related to the legitimate goal of maintaining prison security.[5]

Accordingly, I will grant summary judgment for the defendants and enter a final judgment in the case.

### FINAL JUDGMENT

For the reasons stated in the opinion accompanying this final judgment, it is **ADJUDGED AND ORDERED** that the motion for summary judgment by the defendants is granted and final judgment on the merits is entered in favor of the defendants.

---

5. Since there has been no constitutional violation, I naturally find it unnecessary to decide the qualified immunity issue.