73 A.3d 1186

Meredith CROSS

v.

BALTIMORE CITY POLICE DEPARTMENT.

No. 1290, Sept. Term, 2011.

Court of Special Appeals of Maryland.

Sept. 3, 2013.

Meredith Cross, pro se, Reisterstown, MD, for appellant.

Valerie A. Thompson (Office of Legal Affairs Baltimore Police Department, on the brief) Baltimore, MD, for appellee.

Panel: KRAUSER, C.J., ZARNOCH and J. FREDERICK SHARER (Retired, Specially Assigned), JJ.

ZARNOCH, J.

In this case of a fired police officer, the appellant does not claim, in the words of Justice Holmes, that she has a "constitutional right to be a policeman." *McAuliffe v. City of New Bedford,* 155 Mass. 216, 29 N.E. 517, 517 (1892).[1] Rather, she argues that her employment was terminated in violation of her constitutional right to marry and to engage in intimate association.

Appellant, Meredith Cross, was employed as a police officer in the Baltimore City Police Department ("the Department") from 2004–2010. On July 7, 2009, she received a "Notification of Complaint to Accused," in which it was alleged that she had "been making personal contacts with person(s) of questionable character." On March 9, 2010, the Department officially charged her with four counts of violating its General Orders. All four charges were directly related to appellant's marriage to Carlito Cabana—a convicted murderer and a member of Dead Man, Inc. ("DMI"), a prison gang.

The first charge included four specifications of conduct unbecoming a member of the Department, as she was alleged to have discredited the Department and herself through her marriage to Cabana. The second charge included three specifications of personal contact with a person of questionable character. The third charge alleged that appellant "failed to properly perform her duties and assume the responsibilities of her position." The fourth charge alleged that appellant failed to timely inform her superior officers about the change in her marital status.

On November 30, 2010, appellant, pursuant to the Law Enforcement Officers' Bill of Rights ("the LEOBR"),[2] present-

---

1. The full quote is: "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman."

2. The LEOBR is currently codified at Md.Code (2003, 2011 Repl.Vol.), Public Safety Article ("PS"), § 3–101, *et seq.*

ed her case before a three-person administrative panel (the "Hearing Board"). Appellant pled guilty to the following charges: Charge 1, Specification 4; Charge 3; and Charge 4. These three charges stemmed from appellant's failure within 24 hours to inform her superior officers about her marriage to Cabana. The Hearing Board found appellant guilty of the remaining charges, and recommended her termination. On December 9, 2010, Police Commissioner Frederick Bealefeld, III, terminated appellant's employment.

Appellant appealed this decision to the Circuit Court for Baltimore City, which upheld her termination. She now appeals the circuit court's decision *pro se*.[3]

## FACTUAL BACKGROUND[4]

### A. DMI

In the late 1990s, DMI was formed by three inmates who carried out "hits"[5] for a different prison gang, the Black Guerrilla Family. Over time, DMI has grown in size and scope, and now actively participates in criminal enterprises both in and out of jail. Although each individual unit or "set" varies depending on the location, DMI is organized along the following lines: supreme commander, commander, lieutenant commander, a sergeant at arms, and, in some units, an accountant. Once an inmate joins DMI, he is a member for life and it is impossible for a member to quit the gang.

Detective Joseph Decandeloro, Baltimore City Police, testified that officer safety is an important concern when dealing with DMI members because they pretend to cooperate "[i]n order to gain intelligence." Detective Decandeloro also noted

---

3. Although this appeal is taken *pro se,* Cross acknowledges the assistance of a University of Pittsburgh School of Law professor and students in researching and writing her brief.

4. The facts presented were adduced at the administrative hearing held on November 30, 2010.

5. A "hit" is a "murder committed for money or on orders from a gang leader." *Black's Law Dictionary* 748 (8th ed.2004).

that DMI members are "allowed to have—basically get into our trust, along with any other gang. It's a common practice that they're allowed to deceive us. They're allowed to talk to us. It's the same practice with any gang."

## B. Appellant's Relationship with Cabana

In 2002, appellant lived in New York City and worked as a Financial Advisor for American Express. While in New York City, a friend convinced her to start writing letters to Cabana, who, at the time, was incarcerated in Maryland for second-degree murder.[6] Appellant stated that Cabana "seemed like an intelligent person, and knowledgeable, so he became [her] friend." Soon thereafter, a "serious relationship" developed between appellant and Cabana, and she moved to Baltimore to be closer to him.

In February 2004, appellant applied to be a police officer with the Department. Although she moved to Baltimore specifically to be closer with Cabana, her application did not indicate that she had a boyfriend. While being interviewed for the position, appellant was asked if anyone she knew was in prison. Appellant responded by providing the name of her brother, her friend's husband, and Cabana—who, according to appellant, was her "friend."

Although appellant described her relationship with Cabana in platonic terms during her interview, at some point in 2004 they were married in a "spiritual ceremony" in the Patuxent Institution. According to appellant, it was not a legal wedding; rather, they simply exchanged vows in "a little ceremony [as] part of some Muslim thing [Cabana] was involved in." From that point on, appellant considered herself married to Cabana.

While visiting Cabana in prison, appellant would identify herself as Cabana's wife. From March 16, 2008 to June 15, 2009, appellant visited Cabana 26 times. Cabana called appel-

---

**6.** On November 3, 2009, Cabana was transferred to a correctional facility in Washington State.

lant "108 times during the 90–day period between February 28, 2009, and May 29, 2009." The Department produced evidence that appellant would speak to Cabana on the phone while on duty. In fact, she spoke to Cabana on one or two occasions while answering service calls. The Department conceded that appellant was never heard on the phone giving Cabana any information relating to official police business.

On April 26, 2009, appellant and Cabana were officially married. On July 10, 2009, three days after she was served her Notification of Charges, appellant officially notified her superior officers about the change in her marital status from single to married.

Under the Department's General Order C–2, Rule 6, Section 4, "[m]embers of the Department are required to report through official channels any change in their address, telephone number or marital status within 24 hours." At the administrative hearing, appellant testified that she did not know about this requirement. She testified that she incorrectly believed that she only had to inform her superior officers about any change to her address and phone number.

### C. The Investigation into the Relationship and Cabana's Background

In May 2009, appellant, while visiting Cabana at North Branch Correctional Institution (hereinafter "NBCI") in Cumberland, used the identification of another person to gain entrance. When questioned about this identification by an NBCI staff member, appellant informed prison officials that she was a police officer in Baltimore City, and stated that she must have accidentally used the identification of a person whom she previously arrested. Appellant's misuse of another person's identification was reported to Lieutenant Damon Thomas, Intelligence Officer at NBCI, who called the Department's Internal Affairs unit (hereinafter "IID") "to let them know that … a Baltimore City police officer in fact is coming up to visit a inmate at [the] facility and he's a gang member."

Appellant did not inform her superior officers about her use of another person's identification.

From May to November 2009, Detective Choi Cheung, Baltimore City IID, began working with Lieutenant Thomas to investigate appellant's relationship with Cabana as well as Cabana's ties to DMI. During the course of the investigation, the extent of Cabana's involvement with prison gangs was uncovered. For instance, in 2002, while incarcerated in the Western Correctional Institution (hereinafter "WCI") in Cumberland, Cabana was "validated" [7] by prison officials as a member of a prison gang. [8]

At WCI, Cabana was the supreme commander of DMI, which, according to Lieutenant Thomas, meant that he was "the one who runs the daily organization of the gang, of the inmates that are housed inside the facility." At the hearing, the Department produced a letter addressed to Cabana, which referred to him as an "SC." Lieutenant Thomas explained that SC was shorthand for supreme commander. Additionally, the Department also presented evidence that Cabana was friends with one of the three original founders of DMI.

Cabana and the "top 25 gang members" at WCI were subsequently transferred to NBCI. He was placed on administrative segregation shortly after his arrival at NBCI because prison officials considered him a threat to the security of the prison. Other DMI members and units were apparently unhappy with Cabana's management of DMI, causing Cabana to be the target of a state-wide prisoner "hit list." NBCI officials validated Cabana as a member of DMI in 2006.

While he was still incarcerated in Maryland, Cabana received money orders from appellant. Correctional officers

---

**7.** According to evidence in the record, in order for an inmate to be a validated member of a prison gang, he or she would need to accumulate 10 points on a scale measuring gang-related activities, associations, and identifying traits, such as tattoos. In 2002, Cabana had a total of 22 points.

**8.** Cabana, prior to joining DMI, was a member of a gang called "Natural Born Killers." At some point thereafter, he joined DMI.

knew that appellant was sending Cabana money because they authorized a "mail cover," which enabled law enforcement officers to "pull [Cabana's] mail and look at his mail before the inmate gets it." When Lieutenant Thomas was asked if "the reason for the mail cover was because [Cabana] was a [high-ranking] gang member," he answered: "Yes. Yeah. When you have [high-ranking] people like that we like to look at their mail and see what's going on with them because you get all that information from that."

After the IID investigation into appellant's relationship with Cabana was initiated, correctional officers at NBCI discovered pictures of appellant in Cabana's cell. Specifically, officers found "photographs of [appellant], both in the Baltimore Police uniform and in civilian attire, and a picture of the pyramid [symbolic] of [DMI]." Authorities discovered that "Cabana was also in possession of a letter written by another inmate and DMI gang member named 'Tombstone.'" The Department also presented evidence that at least one high-ranking DMI member knew that Cabana was romantically involved with appellant.

At the administrative hearing, appellant disputed the evidence linking Cabana to a prison gang. She testified that Cabana "was never associating with a gang while he was with me. From the time I knew him, he was never associated with a gang." Appellant also stated that there was "no proof" that Cabana was in a prison gang, "just speculation[.]" However, on September 21, 2009, appellant, during an interview with Detective Cheung regarding her relationship with Cabana, conceded that Cabana "probably was" a member of a gang.

At the administrative hearing, appellant also contended that her marriage to Cabana in no way affected her ability to be an effective law enforcement officer. Three of appellant's co-workers, including her immediate supervisor, testified that appellant was a good cop and that they had no concerns about her relationship with Cabana. Appellant also testified: "I'm a good officer and my work speaks for itself."

During her interview with Detective Cheung, appellant was ordered not to share any information regarding this investigation with anyone. Despite this order, appellant informed Cabana about the investigation. Appellant denied that her sharing of confidential information constituted a conflict of interest or that it violated her agreement to maintain confidentiality.

In his opening and closing arguments, appellant's attorney argued that the officer's termination would violate the First Amendment right to intimate association, a contention the Department challenged.[9]

### D. The Hearing Board's Findings of Fact and Recommendations

The Hearing Board found appellant guilty and found:

[F]rom the year 2002 through the present, Officer Meredith Cross had personal contact with Carlito Cabana, a convicted felon, and an incarcerated high ranking gang member of Dead Man, Inc. currently serving a 30 year sentence at a correctional institute for murder in the 2nd degree.... Officer Cross had visited Mr. Cabana 26 times between the periods of March 1, 2008 to June 15, 2009. Officer Cross is named as Cabana's "wife" on the visitor's list and on the visitor's list history. The Inmate Calling List revealed that Mr. Cabana called Officer Cross 108 times during the 90 day period between February 28, 2009 and May 29, 2009.

---

9. For example, in opening argument, appellant's counsel stated:

The question is can you find someone guilty of association when there's nothing else there because there is nothing else here. When she has a legally protected federal constitutional right to marry who she wants, that's really what's at issue here and that's the issue you're going to have to decide. Does the Department have the right to tell anybody, me, you—you can tell me anything I want but any member of this Department you've waived your First Amendment rights. They're gone. You don't have it. I don't believe they can. Not without some additional evidence of any wrongdoing and there will be none documented in this trial whatsoever.

The Department wants you to believe that she's guilty based purely on her marriage and her contacts and I don't believe that's enough to get you to a violation of the Agency's policy....

The Hearing Board also found that "[t]he DMI is a very violent gang and involved in numerous stabbing[s].... The top positions in the gang are Supreme Commander, Commander, Lieutenant Commander, and Sergeant in Arms (usually the accountant)." Additionally, the Hearing Board found: "The DMI's constitution stated that members are not to snitch to law enforcement, but can speak to them to gain intelligence."

Moreover, the Hearing Board found that at least one DMI leader knew about Cabana's marriage to appellant, and that Cabana knew the officer with whom appellant was working, noting that her partner was a "nice guy." The Board also concluded that appellant married Cabana on April 26, 2009, but did not inform the Department until July 10, 2009.

The Hearing Board concluded that appellant violated General Order C–2, Rule 1,[10] and recommended termination based on this transgression. The Hearing Board also found appellant guilty of violating General Orders C–2, Rule 1, Section 5, and recommended termination.[11] The Board apparently rejected appellant's constitutional argument, making no mention of the issue in its ruling.

On December 10, 2010, Commissioner Bealefeld, pursuant to PS § 3–108, approved the Board's findings and conclusions, thus resulting in the termination of appellant's employment.

---

**10.** General Order C–2 Rule 1, states:

Any breach of the peace, neglect of duty, misconduct or any other conduct on the part of any member of the department, either within or without the City of Baltimore, which tends to undermine the good order, efficiency or discipline of the department, or which reflects discredit upon the department or any member thereof, or which is prejudicial to the efficiency and discipline of the department, even though these offenses may not be specifically enumerated or laid down, shall be considered conduct unbecoming a member of the Baltimore Police Department, and subject to disciplinary action by the Police Commissioner.

**11.** Although not challenged in this appeal, we also note that the Hearing Board found appellant guilty on Charges 3 and 4. With respect to these charges, the Hearing Board recommended a letter of reprimand, instead of termination.

On January 3, 2011, appellant petitioned for judicial review of the decision to terminate her employment. Subsequently, she filed a memorandum of law highlighting two issues:

1. By terminating Officer Cross for her employment with the Baltimore Police Department for reasons stemming from her relationship with her husband, the trial board violated petitioner's First and Fourteenth Amendment rights of free association; and

2. General Order C–2, Rule 1, Section 5 of the Baltimore Police Department's General Orders is unconstitutionally vague and overbroad.

After a hearing on July 18, 2011, the circuit court upheld appellant's termination.[12] Additional facts will be discussed as necessary.

## QUESTIONS PRESENTED

Appellant raises the following four questions,[13] which we have rephrased and reordered:

---

12. The following colloquy occurred at the hearing:

Mr. Davey: Our argument as stated in my brief basically relates to we believe that that policy itself is a violation of the First and Fourteenth Amendment which restricting her—the department has restricted her from her ability to have this freedom of association with an individual.

The Court: I guess how—the department didn't stop her from marrying him, she's' married to him and she can stay married to him.

Mr. Davey: Understood, but we also believe that the department should not terminate her simply because of that marriage, and that's what—

The Court: And show me what says that a high ranking gang member who's convicted of 30—who has a 30—who's serving 30 years for second-degree murder should be married to a police officer who is going to be charged with investigating other members of Dead Man, Inc.?

Mr. Davey: I would only argue that the record—

The Court: When all of her conversations with him are going to to be confidential, be covered by the marital privilege.

13. Appellant has framed the issues in this fashion:

I. Whether the Circuit Court erred in determining that General Order C–2, Rule 1, Section 5 of the Baltimore Police Department General Orders, which prohibits police officers from associating

1. Does General Order C–2, Rule 1, Section 5 impermissibly limit appellant's federal constitutional right to intimate association?

2. Was the Hearing Board's decision to recommend appellant's termination unsupported by substantial evidence?

3. Is General Order C–2, Rule 1, Section 5 unconstitutionally vague and overbroad?

4. Did the Circuit Court err in finding that appellant's termination did not violate PS § 3–103(d)(2)?

We answer no to questions 1 and 2. In addition, we find that issues 3 and 4 were not raised before the administrative agency and are not preserved for our review. Thus, we affirm the circuit court.

## DISCUSSION

### I. Standard of Review

 The standard for appellate review of an administrative agency decision differs depending on whether agency factfinding or law determinations are under attack. Where a factual question or a discretionary judgment is concerned, the reviewing court will uphold an agency's decision so long as it is supported by substantial evidence. *YIM, LLC v. Tuzeer,* 211 Md.App. 1, 24, 63 A.3d 1078 (2013), *cert. denied* 432 Md. 470, 69 A.3d 476 (July 5, 2013) (Citations and quotations omitted). Review of an agency's conclusions of law is less deferential,

---

with people of "questionable moral character," did not unconstitutionally interfere with Officer Cross's right of intimate association protected by the First and Fourteenth Amendments?

II. Whether the Circuit Court erred in determining General Order C–2, Rule 1, Section 5 of the Baltimore Police Department General Orders is not unconstitutionally vague and overbroad?

III. Whether the Circuit Court erred in determining that there was sufficient evidence to support a finding that Officer Cross violated General Order C–2, Rule 1, Section 5 of the Baltimore Police Department General Orders?

IV. Whether the Circuit Court erred in not considering whether Officer Cross's termination from the Baltimore Police Department violated Md. Public Safety Code Ann. § 3–103(d)(2)?

but we often give considerable weight to an administrative agency's interpretation and application of the statute which the agency administers and recognize the expertise of the agency in its own field. *Id.* (Citations and quotations omitted). Under this standard of review, "the appellate court's role is identical to that of the circuit court, and we review the agency . . . decision." *Montgomery County Career Fire Fighters Assoc. v. Montgomery County,* 210 Md.App. 200, 208, 62 A.3d 287 (2013).

 An administrative agency has the authority, if not the duty, to decide constitutional questions raised in the proceeding. *Insurance Comm'r v. Equitable Life Assurance Soc'y. of the United States,* 339 Md. 596, 615–622, 664 A.2d 862 (1995); *YIM, LLC,* 211 Md.App. at 49, 63 A.3d 1078. An administrative determination of a constitutional question is subject to court review as a matter of law. *Equitable Life,* 339 Md. at 619, 664 A.2d 862; *see also Jones v. State,* 343 Md. 448, 457, 682 A.2d 248 (1996) ("When the question is whether a constitutional right . . . has been violated, the reviewing court makes its own independent constitutional appraisal"); *Waicker v. Scranton Times Ltd. Partnership,* 113 Md.App. 621, 637, 688 A.2d 535 (1997) ("When dealing with First Amendment issues, appellate courts make an independent review of the entire record to ensure [there has been no intrusion] on the field of free expression").

 Finally, the reviewing court may not pass upon for the first time issues not encompassed in the final decision of the administrative agency. *Department of Health & Mental Hygiene v. Campbell,* 364 Md. 108, 123, 771 A.2d 1051 (2001); *Mesbahi v. Maryland State Bd. of Physicians,* 201 Md.App. 315, 333, 29 A.3d 679 (2011).

## II. Right to Marry/Right to Intimate Association

General Order C–2, Rule 1, Section 5 (hereinafter "the General Order") states: "Members of the department shall refrain from making personal contacts with persons of questionable character, or visiting places where suspected viola-

tions of the law may be occurring, unless necessary to do so in the performance of their duty." Appellant argues that the Department's application of this General Order interferes with her federal constitutional rights to intimate association and to marry. Specifically, appellant asserts that the General Order "prevents Baltimore [City] Police Officers from engaging in any sort of intimate relationship with anyone the department merely suspects is of 'questionable moral character.'" Appellant also asserts that the order is not enforced using the least restrictive means possible. Appellee responds that this constitutional claim is without merit because appellant was not denied the right to marry or associate by operation of the General Order.[14]

## A. Source of the Rights

Although appellant appears to have challenged her termination before the Hearing Board primarily on First Amendment grounds, most cases—particularly recent caselaw—treat an abridgement of the right to marry as a due process issue under the Fifth or Fourteenth Amendments. For example, in *United States v. Windsor*, —— U.S. ——, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013), a majority of Supreme Court justices struck down the federal Defense of Marriage Act "as a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution." *Id.* at 2695. And in *Conaway v. Deane*, 401 Md. 219, 932 A.2d 571 (2007), a majority of the Court of Appeals, in considering a ban on same-sex marriage, similarly noted that "[i]t is beyond doubt that the right to marry is a federal liberty interest protected by the Constitution." *Id.* at 297, n. 63, 932 A.2d 571. Nevertheless, *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), does recognize that the right to marry and to enter into intimate relationships may be

---

**14.** In the circuit court, appellee claimed that the right to marry/association issue had not been preserved for judicial review. We disagree. *See* n. 9, *supra.* The same is not true of some of appellant's other contentions. *See* p. 316, 73 A.3d at 1198–99, *infra.*

protected by the First Amendment's freedom of association. *Id.* at 617–19, 104 S.Ct. 3244.[15]

Courts that have considered similar constitutional challenges such as that advanced here by appellant have concluded that the same standard of review would apply under the Due Process Clause of the Fourteenth Amendment or the First Amendment. *Wolford v. Angelone,* 38 F.Supp.2d 452 (W.D.Va.1999); *Parks v. City of Warner Robins,* 43 F.3d 609, 615 (11th Cir.1995). Thus, regardless of the source of the constitutional right alleged to be infringed, we will apply the same analysis.

**B. Case Law**

■ Because the right to intimate association is an "intrinsic personal liberty," "the Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees." *Roberts,* 468 U.S. at 620, 104 S.Ct. 3244. However, indirect intrusions on that right may be subject to reasonable regulation. *Zablocki v. Redhail,* 434 U.S. 374, 386–87, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978).

Here, the Department neither prevented appellant from marrying Cabana, nor forced her to obtain a divorce after learning about the marriage. We also note that during the investigation of appellant's marriage, she was allowed to visit Cabana in prison, call him on the phone, and give him money. In fact, throughout her employment with the Department, appellant maintained her relationship with Cabana, and, consequently, her right to intimate association and her right to marry were not violated. *See Wolford,* 38 F.Supp.2d at 463 ("[W]here a policy does not order individuals not to marry, nor . . . directly and substantially interfere with the right to

---

**15.** The right to intimate association primarily protects the right to marry and familial relationships, or, in the words of the Supreme Court, "those that attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." *Roberts,* 468 U.S. at 619, 104 S.Ct. 3244 (Internal citations omitted).

marry, the plaintiff has failed to show that the regulation infringes on either the right to marry or the First Amendment right of intimate association.") (Internal quotations omitted).

Appellant relies on *Briggs v. North Muskegon Police Dep't*, 563 F.Supp. 585 (W.D.Mich.1983), *aff'd without opinion* 746 F.2d 1475 (6th Cir.1984), *cert. denied* 473 U.S. 909, 105 S.Ct. 3535, 87 L.Ed.2d 659 (1985), and *Via v. Taylor*, 224 F.Supp.2d 753 (D.Del.2002), to argue that her constitutional right to intimate association was curtailed. These cases are distinguishable.

In *Briggs*, the plaintiff, a married police officer who was separated from his wife, "was cohabiting with a married woman not his wife." *Briggs*, 563 F.Supp. at 586. After Briggs began renting an apartment with his paramour, he informed the chief of the local police about his living arrangements. *Id.* at 587. Ultimately, Briggs was suspended "'until such time it [was] decided his actions [were] not unbecoming of a police officer for the City of North Muskegon.'" *Id.* Several months later, Briggs did not end his new relationship and, consequently, his employment was terminated. *Id.* He then filed a civil rights action under 42 U.S.C. § 1983 seeking damages for an unconstitutional termination, arguing that his right to privacy and association was violated. *Id.* at 586–87.

A federal district court agreed: "Without doubt, the police department has a legitimate interest in the personal sexual activities and living arrangements of its officers where such activities affect their job performance." *Id.* at 591. But, the plaintiff's performance was not affected, which, in turn, supported a finding that the plaintiff "was discharged because of what defendants anticipated the reaction of the community would be." *Id.* at 592.

The facts in *Via* centered on the firing of Patricia Toomey, a correctional officer, due to her relationship (and eventual marriage) to Via, a paroled former inmate. *Via*, 224 F.Supp.2d at 757. While on parole and under the supervision of a different state agency, Via began living with Toomey, and thereafter the two developed an intimate relationship. *Id.* at

758. Immediately after Via moved into Toomey's residence, she reported the change in her living arrangements to her supervisor, which was required by departmental policy. *Id.* The defendants informed Toomey that her relationship with Via violated the departmental Code of Conduct, which mandated that "[n]o staff person shall have any personal contact with an offender, incarcerated or non-incarcerated, beyond that contact necessary for the proper supervision and treatment of the offender." *Id.* at 759. Toomey, however, "refused to terminate her relationship . . . and was subsequently terminated from her employment for violating the Code of Conduct." *Id.* at 758.

Toomey claimed her rights were violated and a federal district court agreed. The court employed an intermediate level of scrutiny to find that Toomey's right to intimate association had been violated. *Id.* at 761. The district court explained that the defendants failed to "present any evidence of a security incident justifying a change in policy, and Defendants have not proven a rational link between the regulation and security." *Id.* at 765. Additionally, the court rejected defendants' argument that they could terminate Toomey without demonstrating that the relationship caused some workplace disruption. *Id.* at 762, n. 5.

The plaintiff in *Briggs* was not terminated for marrying an incarcerated felon who led a dangerous gang, but for having an adulterous relationship that was assumed by the police department to merit public disfavor. In *Via,* the correctional officer's relationship with a released and pardoned inmate simply does not rise to the same level of public and legitimate police concern as the facts here.

In our opinion, a more instructive and persuasive case is *Bautista v. County of Los Angeles,* 190 Cal.App.4th 869, 118 Cal.Rptr.3d 714 (2010).[16] In *Bautista,* the plaintiff, a Deputy for the Los Angeles County Sheriff's Department, was fired

---

**16.** See also cases discussed in part II.C.

due to his relationship with Shawn Crook, a heroin-addicted prostitute who subsequently became his wife. *Id.* at 715–18.

Bautista was terminated for violating the Sheriff's Department's "prohibited-association policy," which states:

> Members shall not knowingly maintain a personal association with persons who are under criminal investigation or indictment and/or who have an open and notorious reputation in the community for criminal activity, where such association would be detrimental to the image of the Department, unless express written permission is received from the member's unit commander.

*Id.* at 716.

Bautista argued that his termination violated his right to intimate association. The court, however, disagreed with him and affirmed his termination. Because Bautista was allowed to marry and maintained his relationship with Crook, his right to intimate association had not been violated.

Like Bautista, appellant's initial relationship with Cabana was not intimate. Appellant and Cabana, similar to Bautista and Crook, developed a romantic relationship and subsequently married. Also, Crook was deemed to be a person with an open and notorious reputation in the community for criminal activity, and Cabana was deemed a person of questionable character. But most important, appellant married—and still remains wed—to Cabana. As such, we cannot conclude that her right to intimate association was violated.

Having concluded that appellant's right to intimate association was not *directly* abridged, we now address whether the Department has a legitimate purpose to *indirectly* limit or burden an officer's right of association.

### C. Rational Basis or Strict Scrutiny?

■■ Although the right to marry is a fundamental right, not "every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into

the marital relationship may legitimately be imposed." *Zablocki,* 434 U.S. at 387, 98 S.Ct. 673. In other words, strict scrutiny analysis is reserved only for the situations in which the State interferes "'directly and substantially' with that right." *Koshko v. Haining,* 398 Md. 404, 432, 921 A.2d 171 (2007) (quoting *Zablocki,* 434 U.S. at 387, 98 S.Ct. 673); *see also Waters v. Gaston County,* 57 F.3d 422, 425 (4th Cir.1995) ("In essence ... we should apply strict scrutiny only to regulations that 'significantly interfere' with the right to marry.").

■■■ Appellee contends that the "General Order prohibiting members of the Department from associating with persons of questionable character is rationally related to the Department's interest in maintaining discipline and regulating potentially harmful consequences on both the appellant and her coworkers." The Department also contends that this level of constitutional scrutiny is appropriate, rather than a more exacting standard. We agree.

Appellant, although disadvantaged by the Department's application of its General Order, cannot persuasively argue that she was absolutely or largely prevented from forming an intimate association with Cabana. At all times while employed with the Department, appellant had an intimate association with Cabana. *See Keeney v. Heath,* 57 F.3d 579, 580 (7th Cir.1995) ("The defendants did not, of course, forbid Nancy Summers (now Nancy S. Keeney) to marry; they did not even forbid her to marry Mitch; but they made it more costly for her to marry him, the cost being the loss of her job, or more precisely the loss of whatever margin made it a better job for her than any other that she could get. By doing this the defendants undoubtedly burdened her right to marry, though they did not deter her from marrying. They could impose a burden of this character ... only if they had some justification....").

"Because the burden on the right to marry was indirect in this case, it qualifies as a light or moderate burden." *Wolford,* 38 F.Supp.2d at 462. Accordingly, we will apply a rational

**314**

basis analysis in the case before us, rather than more severe scrutiny.

 The test is whether there is a rational connection between the regulation at issue and the city's "method of organizing its police force, and the promotion of safety of persons and property." *Kelley v. Johnson*, 425 U.S. 238, 247, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976); *see also Hodgson v. Minnesota*, 497 U.S. 417, 435, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) (explaining that "State regulation of ... marriage is obviously permissible" but this regulation "must be predicated on legitimate state concerns other than disagreement with the choice the individual has made").

Here, the General Order is rationally related to the Department's goal of furthering public trust of the police in the community, maintaining discipline within the ranks of its force, and ensuring the safety of its employees. *See Ortiz v. Los Angeles Police Relief Ass'n*, 98 Cal.App.4th 1288, 1314, 120 Cal.Rptr.2d 670 (Cal.Ct.App.2002) ("In sum, we find that Ortiz's right to marry, as guaranteed by the privacy provision of the California Constitution, was not violated because [the police department]—in response to Ortiz's decision to marry an incarcerated felon—made a rational decision to further legitimate interests: the personal safety and well-being of police officers and their families.").[17]

---

**17.** We also note that other jurisdictions have, in analogous cases, reached the same conclusion. *See Lape v. Pennsylvania*, 157 Fed.Appx. 491, 499 (3d Cir.2005) ("Just the suspicion of favored treatment could create serious problems of morale. Prisoners not married or engaged to guards would attribute any differences in treatment between themselves and such prisoners to the relationship. Finally, we are unaware of any ready alternatives that could fully accommodate this right at a de minimus cost to the interests of security at the facility.") (Internal citations and quotations omitted); *Ross v. Clayton County, Georgia*, 173 F.3d 1305, 1311 (11th Cir.1999) ("Personal associations with felons or active probationers could undermine appropriate objectives of a law enforcement agency."); *Wieland v. City of Arnold*, 100 F.Supp.2d 984, 989 (E.D.Mo.2000) ("Simply because Wieland's relationship has not affected his own performance on the job does not make it unreasonable to assume a very real likelihood that it could affect the chain of command as well as the public image of the department. When

Based on our examination of the facts at hand as well as analogous cases in other jurisdictions, we hold that the Department's interest is clearly legitimate, and the application of the General Order to the factors of this case is a rational means for advancing this interest. *See Akers v. McGinnis,* 352 F.3d 1030, 1039 (6th Cir.2003).

## III. Substantial Evidence

 Appellant argues that the Hearing Board's findings were not supported by substantial evidence. In her brief and reply brief, appellant frequently and strongly asserts that the record is "devoid of any . . . evidence" that Cabana is or was a member of DMI. Appellant supports this contention by arguing the following: Detective Cheung, the person who led the investigation of appellant's marriage to Cabana, knows little about DMI; the Department failed to produce any letters written by Cabana indicating his affiliation with DMI; and Cabana was transferred to a prison in the State of Washington for his safety.

Appellee counters that "[t]here was substantial evidence upon which the [Hearing Board] based its finding that Cabana is indeed a person of questionable character." Appellee also presents the following observation: "Curiously absent from appellant's brief is an argument that, despite Cabana's lengthy criminal record and current sentence for second-degree murder, he is somehow not a person of questionable character."

Here, the Hearing Board's findings were supported by substantial evidence that Cabana was a member of a prison gang. This evidence included testimony that in August 2006, approximately two years after appellant was hired as an officer, Cabana was confirmed as a member of DMI. In order for an inmate to be a validated member of a prison gang, he or she would need to accumulate ten points on a scale measuring gang-related activities, associations, and identifying traits such

Wieland appears at public functions in the company of a known felon, that potentially undermines his authority as a law enforcement officer.").

as tattoos. Cabana had sixteen points, including two points for organizing and promoting gang activity. Furthermore, the Department produced a letter addressed to Cabana, which referred to him as SC, or, according to Lieutenant Jackson, supreme commander of DMI. The Department was justifiably concerned with a police officer's marriage to an inmate in this position. As noted by the circuit judge, *see* n. 12, *supra,* appellant could be directed to investigate DMI and the officer's communications with Cabana would be protected from governmental scrutiny by the marital privilege.

We hold that termination of appellant's employment was supported by substantial evidence.

### IV. Remaining Issues

In our view, neither question 3 nor question 4 on this appeal have been preserved for our review. The vagueness issue was raised for the first time in appellant's petition for review in the circuit court, not before the Hearing Board. Thus, we will not consider the question. *See Campbell,* 364 Md. at 123, 771 A.2d 1051. Her challenge under PS § 3–103(d)(2) [18] was not specifically raised before the Hearing Board or in the circuit court. To the extent this statutory claim seeks to advance a constitutional issue other than the right to marry / right to association question, that issue has not been preserved. To the extent it mirrors the only constitutional question she has properly raised, we have already resolved the matter in part II of this opinion.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

18. Paragraph (d)(2) states:

 A law enforcement officer may not be discharged, disciplined, demoted, or denied promotion, transfer, or reassignment, or otherwise discriminated against in regard to the law enforcement officer's employment or be threatened with that treatment because the law enforcement officer ... has lawfully exercised constitutional rights.